2004-NMCA-058

92 P.3d 13

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Richard JOHNSON, Defendant–Appellant.**

**No. 22,890.**

Court of Appeals of New Mexico.

March 15, 2004.

Patricia A. Madrid, Attorney General, Santa Fe, NM, M. Anne Kelly, Assistant Attorney General, Albuquerque, NM, for Appellee.

John B. Bigelow, Chief Public Defender, Trace L. Rabern, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

CASTILLO, Judge.

{1} Defendant Richard Johnson appeals his conviction of criminal damage to property on two grounds: (1) that the trial court erred in denying his motion to suppress the out-of-court and in-court identifications by two witnesses and (2) that the trial court impermissibly sentenced him to thirty days of jail time for his failure to admit guilt at sentencing. We hold that the trial court improperly denied Defendant's suppression motion. We reverse Defendant's conviction and remand for a new trial. We do not address the merits of the sentencing issue.

## I. BACKGROUND

{2} During the early morning of April 30, 2000, while it was dark, Arturo Montano noticed a car stopped in front of his house with two or three people arguing in it; the car then moved farther up the street and parked. The area in front of Montano's house where the car initially stopped was well lit; the area where the car finally parked was not lit as well. Two individuals (perpetrators) got out of the car; Montano saw them shaking spray cans. He returned to his house and alerted his roommate, Michael Flores, that there was some activity going on; Flores joined Montano outside to observe the activity. They saw the two perpetrators across the street and down a couple of houses by the car of a neighbor, Selena Garcia. One perpetrator was standing by a fence, watching while the other was spray-painting Garcia's car; the two perpetrators then exchanged places. According to Montano, the perpetrators were also spray-painting another vehicle next to Garcia's car; he thought the other vehicle might have been a truck. Flores was between 60 and 75 to 80 yards away from the perpetrators; Garcia's car was in an area well lit by streetlights. Montano could see the perpetrators "[p]retty good"; Flores indicated he had no trouble seeing what was going on. He watched the two perpetrators spray-painting for fifteen to twenty minutes; Montano watched for up to forty-five minutes.

{3} At some point, Montano walked within 10 feet of the perpetrators' car so that he could get the license plate number. It is unclear how far away that car was from Garcia's car, but it was "pretty dark" in that area. After getting the license plate number, Montano called the police from a pay phone. At some point, he wrote the number down on a piece of paper as 37566N. The

two perpetrators drove off in the car in which they arrived; Flores believed the car was a gold, yellow, or off-tan later model Ford with square lights. Montano did not know the make or model of the car but indicated it was not new, was beige, and had square lights. He noticed the car was damaged toward the front, maybe on the bumper or grill. Flores did not remember any body damage.

{4} That morning, Garcia called the police after finding her car vandalized. A police officer was dispatched to her home. At the request of Garcia, the officer later returned to speak for the first time with the two witnesses, Montano and Flores. Montano gave the officer the license plate number he had written down. Flores told the officer that one of the perpetrators was African–American, between 6 feet and 6 feet 2 inches, with a slim build, and wearing a T-shirt with "an emblem on it that stood out big time." Flores was unable to describe the second perpetrator, whom he had heard but never saw. There is no indication in the record that on April 30, Montano gave the officer any description of either perpetrator.

{5} On May 10, at the request of the police, Montano and Flores went to a business parking lot and were asked to identify the vehicle they had observed on April 30. They were driven around the parking lot in a police car. There were five to eight other vehicles in the lot; only one was brown or beige. Flores immediately spotted a car that was "very similar" to the one he remembered from April 30. It took Montano "a while . . . to figure it out"; he did so when he realized the license plate matched in part the plate number he had written down. He also noticed the car had the square lights he remembered from April 30. The actual number on the license plate was 375GGK; the car was a Pontiac LE owned by Defendant.

{6} Montano and Flores then sat in a police car across the street from Defendant's place of business while police conducted a showup. In the showup, police told the witnesses that an officer was going to bring out an individual; the witnesses were asked to see if they recognized him. According to Flores, the car was about 400 or 500 yards away from the individual. The record does not specify what the witnesses said to the police at the showup; but, evidently, both witnesses indicated they recognized the individual from the scene of the crime.

{7} Defendant subsequently moved to suppress the identification of him made by Montano and Flores. At the motion hearing, Montano testified that he recognized Defendant on May 10 because of his features; his bald head and his ears looked "pretty close" to that of one of the perpetrators Montano saw on April 30. Montano also testified that he did not know whether he could remember the second perpetrator, whom Montano described only as "the white guy or the light Hispanic." Flores, likewise, was unable to describe the second perpetrator. Following the hearing, the trial court denied the motion, based on the totality of the circumstances.

{8} At trial, Flores testified that he observed one perpetrator "very well" on April 30 and that he did not get a good look at the other perpetrator because Flores "was concentrating on the one gentleman that was right there . . . in the street that was very clearly visible." Flores further testified that although he was a good distance away from Defendant's place of business during the showup on May 10, he could see people "very clearly." Flores said he had "[n]ot a question at all" in his mind that it was Defendant he saw on April 30. Montano, other than to say he was able to give the police "somewhat of a description" of one perpetrator, gave no trial testimony as to what he told the police on April 30 about what the perpetrators looked like; he did testify that "[o]ne of them was more distinct" and that one looked African–American, while the other looked like a "light Hispanic or white guy." Montano said he was "100[ ]percent sure" that the car in the photographs submitted as evidence at trial was the same car he saw on April 30.

## II.  DISCUSSION

{9} Before proceeding with our analysis, we briefly address two matters: whether the trial court mistakenly analyzed the showup identification as a credibility question for the jury, as Defendant asserts, and whether De-

fendant filed a motion to suppress identification of the car.

{10} The trial court's ruling included the statement "I think it's a matter of credibility of evidence, to the jury, so the motion to suppress is denied." Defendant presents this as evidence of the trial court's refusal to evaluate for itself the reliability of the identification, as required under the totality of the circumstances test. We disagree. The court clearly stated that its decision was based on the totality of the circumstances. Furthermore, once the court made the decision to admit the testimony, the identification was indeed a matter of credibility for the jury. *See State v. Cheadle*, 101 N.M. 282, 286, 681 P.2d 708, 712 (1983) ("Once a court finds that the evidence is admissible, it becomes a jury determination as to the accuracy of a witness'[s] identification."). There is no indication from the record that the trial court failed to apply the totality of the circumstances test to determine the reliability of the showup identification or that the trial court otherwise "refused [its] function as gatekeeper," as Defendant claimed.

{11} Defendant's counsel suggested at oral argument that a motion to suppress identification of the car was "lumped in together" with the motion to suppress identification of Defendant. We do not interpret the motion submitted to the trial court in such a fashion. Defendant specifically moved the trial court to "[s]uppress the identification of Mr. Johnson." Our opinion, therefore, concerns the suppression of that identification, not of the identification of the car.

## A.   Standard of Review

{12} The parties disagree as to the standard of review. Defendant, without citing authority, urges de novo review in the reply brief. The State, citing *State v. Maes*, 100 N.M. 78, 82, 665 P.2d 1169, 1173 (Ct.App. 1983), requests us to review the court's decision for abuse of discretion. We disagree that *Maes* sets an abuse of discretion standard for suppression of identification testimony. When, as here, the trial court's decision involved factual and legal questions, this Court will defer to the trial court's purely factual assessment; however, we are not

bound by the court's application of law to the facts. *See State v. Attaway*, 117 N.M. 141, 144–46, 870 P.2d 103, 106–08 (1994) (discussing standards of review for fact-finding and for mixed questions of fact and law). This standard is the same as that used in suppression cases where our review is "whether the law was correctly applied to the facts, viewing them in the manner most favorable to the prevailing party[,] and drawing all reasonable inferences in support of the court's decision." *State v. Salgado*, 1999–NMSC–008, ¶ 16, 126 N.M. 691, 974 P.2d 661 (internal quotation marks and citation omitted). Because the trial court's ultimate conclusion drawn from the facts was a legal determination, that is, that the witnesses' testimony did not violate Defendant's due process rights, we review it de novo. *See Attaway*, 117 N.M. at 144–46, 870 P.2d at 106–08.

## B.   Identification

### 1.   Out–of–Court Identification

{13} In reviewing the admissibility of showup identification, we analyze whether the procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification and, if so, whether the identification is nonetheless reliable under the totality of the circumstances. *See Patterson v. LeMaster*, 2001–NMSC–013, ¶ 22, 130 N.M. 179, 21 P.3d 1032; *State v. Padilla*, 1996–NMCA–072, ¶ 20, 122 N.M. 92, 920 P.2d 1046; *see also State v. Stampley*, 1999–NMSC–027, ¶ 14, 127 N.M. 426, 982 P.2d 477; *State v. Nolan*, 93 N.M. 472, 476, 601 P.2d 442, 446 (Ct.App. 1979). Reliability of the identification is a due process requirement. *Patterson*, 2001–NMSC–013, ¶ 20, 130 N.M. 179, 21 P.3d 1032. To assess reliability, "courts weigh the corrupting effect of the suggestive identification" against five factors. *Id.* (internal quotation marks and citations omitted). Those factors are (1) the witness's opportunity to view the perpetrator at the time of the crime, (2) the witness's degree of attention at the time of the crime, (3) the accuracy of the witness's pre-identification description, (4) the certainty of the witness, and (5) the time elapsed between the crime and the identifica-

tion. *Id.; Cheadle,* 101 N.M. at 284, 681 P.2d at 710.

{14} Showup identifications are inherently suggestive, and their use "should be avoided." *Patterson,* 2001–NMSC–013, ¶ 21, 130 N.M. 179, 21 P.3d 1032; *see Padilla,* 1996–NMCA–072, ¶ 19, 122 N.M. 92, 920 P.2d 1046. Citing these two cases, Defendant's appellate counsel insists that New Mexico prohibits any use of showup identifications, unless courts first find that exigent circumstances made a showup the only feasible means of identifying a perpetrator. When questioned at oral argument, defense counsel suggested that when our Supreme Court in *Patterson* wrote that showups "should be avoided," it meant to write "should be avoided, unless it's necessary." In further support of her exigency theory, counsel also referred to language in *Padilla* where this Court quoted from 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 7.4(f), at 590 (1984): "In particular, showups should be deemed to violate due process absent the most imperative circumstances." *Padilla,* 1996–NMCA–072, ¶ 19, 122 N.M. 92, 920 P.2d 1046 (internal quotation marks and citation omitted). That line was quoted in our response to Padilla's request that we reexamine New Mexico precedent on showups; we recognized in *Padilla* that showups have been sharply criticized and that their use has been discouraged elsewhere, absent exigent circumstances. *Id.* But we declined to establish an exigency rule in *Padilla,* and our Supreme Court did not do so in *Patterson.* We therefore reject counsel's interpretation of those cases.

{15} Counsel suggests in the brief in chief that other states have "focused on the need to show exigent circumstances as a matter of state constitutional law." To the extent that she requests we establish an exigency rule in this case, we find that the state constitutional issue was not preserved below. *See State v. Gomez,* 1997–NMSC–006, ¶¶ 22, 23, 122 N.M. 777, 932 P.2d 1 (stating preservation requirements for a party's assertion that the state constitution offers greater protection than the federal). We therefore do not address it; we return now to our analysis.

{16} As indicated above, showup identifications are inherently suggestive. *Patterson,* 2001–NMSC–013, ¶ 21, 130 N.M. 179, 21 P.3d 1032; *Padilla,* 1996–NMCA–072, ¶ 20, 122 N.M. 92, 920 P.2d 1046. Although Defendant was not sitting in the back of a police vehicle during the showup, as in *Patterson,* or spotlighted by the headlights of a police vehicle, as in *Padilla,* we nevertheless find the circumstances around the showup highly suggestive. In particular, we are concerned that the showup occurred immediately following the witnesses' identification of the car they saw on April 30. This sequence could have led the witnesses to believe that the person whom police brought out for the showup was the owner of that car. In addition, the police showed the witnesses both the car and Defendant on May 10 while the witnesses were together. These circumstances contribute to making the procedure used highly suggestive. The indicia of reliability must be significant to outweigh the suggestiveness. *Patterson,* 2001–NMSC–013, ¶ 22, 130 N.M. 179, 21 P.3d 1032. We next evaluate the reliability of the identification by considering the five factors.

{17} There is no doubt that the witnesses had the opportunity to view the perpetrators for an appreciable period of time: Flores watched the activity for fifteen to twenty minutes; Montano, for up to forty-five minutes. Although there was testimony that the area around the perpetrators' car was "pretty dark," the area around Garcia's car, which the perpetrators were spray-painting, was well lit. We are concerned, however, about the distance between the witnesses and the perpetrators and about the absence of evidence that either witness saw the face of the perpetrator they identified. Flores was between 60 and 75 to 80 yards away from Garcia's car. Montano does not clearly testify as to his distance from the perpetrators; we presume from the conversation that took place between Montano and Flores about phoning the police that Montano was standing at least part of the time with Flores while watching the spray-painting. Montano may have had a closer view of the perpetrators when they initially drove up in front of his house; the testimony, however, indicates

only that he could not tell whether there were two or three people in the car.

{18} The distance and lack of facial identity make this case very different from others in which our Courts concluded that the witnesses had opportunity to view the perpetrators. *See State v. Jacobs,* 2000–NMSC–026, ¶ 32, 129 N.M. 448, 10 P.3d 127 (stating that the witnesses spoke with the perpetrator before accepting a ride with him and that they observed what he looked like during the fifteen-minute car drive); *Stampley,* 1999–NMSC–027, ¶ 24, 127 N.M. 426, 982 P.2d 477 (explaining how the witnesses directly looked at the perpetrator's face and therefore had ample opportunity to view him); *Cheadle,* 101 N.M. at 284–85, 681 P.2d at 710–11 (discussing how all four witnesses either talked directly to the perpetrator within inches of his face or saw him up close and stating that two witnesses testified as to his facial or hair features); *Nolan,* 93 N.M. at 473, 601 P.2d at 443 (noting that the witness was able to observe the perpetrator at close range and describe his beard, hair, and eye color).

{19} We find the circumstances here to be more like those in *Padilla* and *Patterson.* In *Padilla,* the witness observed the criminal activity from across the street and did not testify as to seeing the perpetrator's face. *Padilla,* 1996–NMCA–072, ¶¶ 16, 21, 122 N.M. 92, 920 P.2d 1046. We concluded that the reliability of the witness's identification was questionable. *Id.* ¶ 21. In *Patterson,* the witnesses, although perhaps in close proximity to the perpetrator, had a very limited view of the perpetrator's face and hair, both of which were concealed. Our Supreme Court determined that the perpetrator's most distinctive physical characteristics were not visible to the witnesses; it held that the lack of an opportunity to view those characteristics weighed against the reliability of the identification. *Patterson,* 2001–NMSC–013, ¶¶ 4, 5, 23, 130 N.M. 179, 21 P.3d 1032. Similarly, here, the witnesses' distance from the perpetrator they identified and the absence of testimony as to having seen his face lead us to conclude that the witnesses did not have the opportunity to view the perpetrator's most distinctive characteristics.

The first factor, therefore, does not indicate reliability.

{20} There is no evidence that the witnesses' degree of attention was impaired during the period of time they observed the perpetrators. The second factor, therefore, weighs toward reliability.

{21} There is, however, no indication of reliability from the third factor, accuracy of the pre-identification description. Flores testified at the motion hearing that he described one perpetrator to the police as African–American, 6 feet to 6 feet 2 inches tall, with a slim build, and wearing a T-shirt with "an emblem on it that stood out big time." Flores did not suggest what the emblem looked like, so there is no way of assessing whether it made the T-shirt an uncommon item of clothing or not. Defendant is African–American, so Flores accurately described his race. While the trial court and jury had the opportunity to assess Defendant's height and build, there is nothing in the record indicating Defendant's height or build. Even if we assumed Defendant to be 6 feet to 6 feet 2 inches and slim, it would not be enough to indicate reliability. *See Patterson,* 2001–NMSC–013, ¶ 24, 130 N.M. 179, 21 P.3d 1032 (concluding that descriptions of height, weight, and age are "very sketchy" and that although they may bolster an otherwise detailed physical description, they do not by themselves signify reliability). There was no testimony on whether Defendant owned the T-shirt with the emblem described by Flores.

{22} Montano provided details of features at the motion hearing, when he testified that Defendant looked like one of the perpetrators Montano saw on April 30; he testified that he recognized Defendant on May 10 by his bald head and his ears. Montano also stated that the perpetrator was wearing a windbreaker with a medical emblem on it, although he was not sure if it was indeed a medical emblem. However, there is no evidence that any of these descriptions were given to the police before the showup. Montano merely stated at trial that he gave the police "somewhat of a description." Montano did testify that he gave the police the license plate number of the car he saw on April 30;

as we stated above, however, Defendant's motion to suppress identification concerned the witnesses' identification of him, not of the car. We cannot conclude, therefore, that the reliability of Flores's or Montano's identification of Defendant at the showup was supported by the accuracy of their pre-identification descriptions.

{23} The fourth factor is the level of the witnesses' certainty of identification. As we stated above, we are unable to assess from the record exactly what either witness told the police at the showup itself. However, Flores expressed no doubt at the motion hearing that he recognized the individual at the showup as the one he saw on April 30. In *Patterson*, our Supreme Court noted that when the witness finally identified the perpetrator at the showup, he did so on the basis of common items of clothing worn by the perpetrator, rather than any distinctive physical characteristics, which the witnesses never had the opportunity to view. *Patterson*, 2001–NMSC–013, ¶¶ 24–25, 130 N.M. 179, 21 P.3d 1032. The Court concluded that this factor did not indicate reliability. *Id.* ¶ 25. We therefore temper Flores's certainty with the absence of evidence that Flores saw any of the perpetrator's distinctive physical characteristics.

{24} Montano provided scant testimony on the certainty of his identification. When asked by defense counsel at the motion hearing if there was any question in his mind as to whether the individual the police showed him on May 10 was the same individual he saw on April 30, Montano did not directly answer the question. His only response was that he was wondering about "the other guy, the white guy or the light Hispanic." Montano testified that the African–American was "[m]ore distinctive," but we are unable to gauge the certainty of the showup identification from this remark or from any of Montano's other testimony. This factor does not weigh in favor of the reliability of Montano's identification; it weighs slightly in favor of Flores's identification.

{25} The length of time between the crime and the identification, the fifth factor, is ten days and unlike the length of time in other showup cases. *See, e.g., Patterson*, 2001–

NMSC–013, ¶¶ 7, 8, 25, 130 N.M. 179, 21 P.3d 1032 (stating there was "little time" between the crime and the showup, occurring immediately afterwards); *Padilla*, 1996–NMCA–072, ¶ 16, 122 N.M. 92, 920 P.2d 1046 (observing the showup occurred shortly after the crime); *see also Nolan*, 93 N.M. at 477, 601 P.2d at 447 (stating only a "few short hours" elapsed between the crime and the photographic identification). *But see Stampley*, 1999–NMSC–027, ¶ 29, 127 N.M. 426, 982 P.2d 477 (holding that "[a] one-month lapse of time [for a photographic identification] is not unreasonable, particularly under these circumstances where the witnesses had an opportunity to view the shooter and where their attention ... was focused directly on the shooter"). Defendant argues, without citation or authority, that "the memory of the perpetrators was no longer fresh in [the witnesses'] minds" by the time of the showup; we find no testimony to that effect. We are not willing to conclude in this case that ten days is impermissibly long. However, we conclude that the length of time between the crime and the identification neither strengthens nor undermines the existence of reliability, given Montano's absence of certainty and the weakness of Flores's certainty of identification, as well as the lack of an opportunity either witness had to view the perpetrator.

{26} Having considered each of the factors, we determine that the showup identification lacked the indicia of reliability necessary to overcome the suggestiveness of the identification procedure. We next turn to the in-court identification.

## 2. In–Court Identification

{27} In-court identification is only admissible if it is independent of and not tainted by extrajudicial identification. *Cheadle*, 101 N.M. at 285, 681 P.2d at 711. We concluded above that the showup was highly suggestive and that the witnesses' identification of Defendant at the showup was unreliable. Under these circumstances, we hold that the showup identification tainted the in-court identification by both witnesses. *Cf. Stampley*, 1999–NMSC–027, ¶ 31, 127 N.M. 426, 982 P.2d 477 (holding that since the pretrial identification procedures were not

unduly suggestive, they could not have tainted any subsequent identification); *Nolan*, 93 N.M. at 477, 601 P.2d at 447 (concluding that in-court identification was not tainted, based upon the reliability of the out-of-court identification). As a result, the in-court identification is inadmissible.

{28} We hold that the trial court incorrectly denied Defendant's motion to suppress the out-of-court and in-court identifications of Defendant. Without the identifications, we cannot say that the State was able to prove beyond a reasonable doubt that Defendant intentionally damaged the property of another. *See State v. Esguerra*, 113 N.M. 310, 315, 825 P.2d 243, 248 (Ct.App.1991) ("Error in the admission of evidence in a criminal trial must be held prejudicial ... if there is a reasonable possibility that the evidence complained of might have contributed to the conviction."). We therefore reverse Defendant's conviction.

## III. CONCLUSION

{29} We reverse Defendant's conviction and remand for a new trial consistent with this opinion.

{30} **IT IS SO ORDERED.**

WE CONCUR: CYNTHIA A. FRY and MICHAEL E. VIGIL, Judges.