This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                           **No. A-1-CA-34350**

**BRITTON QUERREL SCOTT,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF GRANT COUNTY**
**J.C. Robinson, District Judge**

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**ZAMORA, Judge.**

{1}     Defendant appeals his convictions for aggravated battery with a deadly weapon and criminal trespass. On appeal, Defendant claims that the district court erred in: (1) denying the motion to suppress the witness identification and admitting that identification at trial; (2) refusing Defendant's instruction on eyewitness identification; and (3) giving an erroneous instruction to the jury for the aggravated battery charge. We affirm.

{2}     Because this is a memorandum opinion and the parties are familiar with the factual background, we will reserve discussion of the pertinent facts for our analysis.

**I.      DISCUSSION**

**A.      Motion to Suppress Identification**

{3}     Defendant filed a motion to suppress Victim's out-of-court and in-court identifications of him as the person who attacked her in her home, claiming that such identifications were in violation of his due process rights under the United States Constitution and New Mexico Constitution. Defendant challenges two separate in-court identifications—at his dangerousness hearing and preliminary hearing. Both times Defendant was in a jail uniform and seated next to his attorney. Defendant contends that the identifications can be considered "show-up" identifications, which are "inherently suggestive," and therefore, the identifications should be suppressed. Defendant further argues that the due process violation under the United States

2

Constitution is the unreliability of Victim's in-court identifications relying in part on her out-of-court identifications. Last, he contends that: (1) the federal constitutional analysis is flawed; and (2) several other states have used their constitutions to deviate from the flawed federal analysis and so should New Mexico. The motion was denied.

{4}     "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Paananen*, 2015-NMSC-031, ¶ 10, 357 P.3d 958 (internal quotation marks and citation omitted). We review "factual matters with deference to the district court's findings if substantial evidence exists to support them, and [we] review[] the district court's application of the law de novo." *State v. Almanzar*, 2014-NMSC-001, ¶ 9, 316 P.3d 183.

{5}     Our Supreme Court has stated that "[s]how[-]up identifications are inherently suggestive and should be avoided." *Patterson v. LeMaster*, 2001-NMSC-013, ¶ 21, 130 NM 179, 21 P.3d 1032 (internal quotation marks and citation omitted). In reviewing the admissibility of such show-up identifications, we must therefore determine "whether there are sufficient indicia of reliability to outweigh the suggestiveness of the procedure followed in this case." *Id.* ¶ 22; *State v. Baca*, 1983-NMSC-049, ¶ 18, 99 N.M. 754, 664 P.2d 360 (stating that the reliability is "the linchpin in determining the admissibility of identification testimony"). To determine the reliability of a victim's identification of a defendant, we look at the totality of the

circumstances under which the identification was made. *See Baca*, 1983-NMSC-049, ¶ 17. *Patterson* enumerates several factors for us to consider in this determination: (1) the opportunities the victim had to view the perpetrator at the time of the attack; (2) the degree of attention paid by the victim; (3) the accuracy of the victim's description of the perpetrator; (4) the victim's level of certainty when identifying the defendant in court; and (5) the time between the attack and the victim's identification of the defendant. *See* 2001-NMSC-013, ¶ 20.

{6}     Before the attack and prior to Victim's in-court identifications of Defendant, she had several opportunities to see Defendant outside of her house. At the motion hearing and at trial, Victim testified that she had seen Defendant a couple of days before the attack when he was attempting to climb her back fence, and she got a good look at him then. At the time, Victim saw someone starting to climb her fence and she stuck her head out through her door, looked at him for a couple of seconds and yelled at him, and he ran away. Victim called the police to report this incident. As well, Victim had seen Defendant pushing a motorcycle in front of her house about one to two times a week, which she thought was unusual, over a one to two-month time frame. Defendant usually pushed the motorcycle with his head down; however on one occasion Victim did see his face. About a week before the attack and during the day, it was summer and hot and Victim was in her front yard with her grandson playing

4

with water guns. Victim's grandson got too close to the street just as Defendant was pushing the motorcycle in the front of her house. It was at this time that Victim yelled at her grandson to get away from the street. This got Defendant's attention and he looked up and glared at her. The person climbing over the fence and the person pushing the motorcycle were the same person.

{7} During the attack, Victim had a couple of opportunities to view the attacker's face. She testified that she got home around 5:00-5:30 p.m. to check on the dog. Victim came out of her bathroom and saw Defendant standing in the hallway. He was standing about ten feet away and she could see his face. She tried to run to the door to get out of the house. Defendant grabbed her arm and lunged for her. Victim did not see his face until she kicked him and he ended up on top of her, with her back against the coffee table. Defendant was about two feet away from Victim. Victim specifically remembered her feet hitting the plants and the kitchen chairs on the floor. When Victim punched Defendant in the throat, he picked up his knife and then ran out of the house towards the backyard. On cross-examination, Victim stated that Defendant was in her house ten minutes or so during this attack. Victim also testified that Defendant had a bad and distinctive smell, like "baloney."

{8} After the attack, Victim called the police. She described her assailant as male, about 35 or 40 years old, white, tall, really skinny, wearing camouflage pants and a

dirty white t-shirt, with blond hair. When questioned about her description of Defendant as having short blond hair, she explained that she views shoulder-length hair as short, and that she did not remember describing Defendant's hair as blond but, to her, blond hair is only a little lighter than her own brown hair. Victim testified that she sees Defendant's face every time she goes to sleep. Victim testified that the person that attacked her is the same person she saw climbing her fence and near her grandson. Victim identified Defendant as the person who attacked her and stated that she had no doubt he was the one who attacked her. Victim also confirmed the recording of the 911 call, particularly whene she described the incident of the person climbing over the fence.

{9}     The day after the attack, Victim was shown a photo array, consisting of six driver's license photos. At the time, Victim was very shaken up, had been throwing up, and was suffering the effects of a concussion from her encounter with Defendant in her home. Though she focused upon a photo of a man that was in fact not Defendant, she did not then commit to an identification.

{10}     At trial, Officer Joseph Arredondo testified that Victim provided Defendant's name to him as the person who had previously attempted to trespass on her property, and police were able to verify that Defendant was on record as receiving a couple of trespass warnings related to Victim's address. Officers obtained a t-shirt and

6

camouflage pants from Defendant's home. The t-shirt emitted a very strong odor such that the officer alerted the laboratory about the smell. Police also recovered several knives from Defendant's residence, including a military-type knife.

{11} Defendant strongly emphasizes Victim's description of her attacker's hair as short and blond, that she did not pick Defendant out of a photograh array made up of driver's license photographs, and that she was focusing on someone else's photograph. Defendant also relies heavily on testimony from his expert on witness identification that eyewitness testimony is often unreliable, and that stress can affect the memory.

{12} The evidence reveals that Victim was visually familiar with Defendant based on her own previous encounters with him right before the attack. The circumstances of this case are similar to other cases where the victims and witnesses to crimes have had the opportunity to closely observe their perpetrator in intrinsically unforgettable circumstances. *See State v. Ramirez,* 2018-NMSC-003, ¶ 8, 13, 409 P.3d 902 (concluding that there was more than sufficient evidence and indicia of reliability to identify the defendant as the shooter, where the victim was seated in a vehicle with his family when defendant spoke with and shot victim as well as a witness parked near by who witnessed the shooting transpire); *State v. Flores*, 2010-NMSC-002, ¶ 60, 147 N.M. 542, 226 P.3d 641 (holding that "the totality of the circumstances strongly

supports the trial court's findings that the witness's identification of [the d]efendant was reliable and not influenced by the out-of-court identification" where the witness had observed and spoken with the perpetrator several days before the crime occurred and had observed the perpetrator several times on the day of the crime, and that the witness described the perpetrator's features, clothing, and manner of speech); *State v. Stampley*, 1999-NMSC-027, ¶ 24, 127 N.M. 426, 982 P.2d 477 (stating that witnesses who were in a car at which the perpetrator fired shots, had ample opportunity to observe the perpetrator); *State v. Cheadle*, 1983-NMSC-093, ¶ 8, 101 N.M. 282, 681 P.2d 708 (explaining that the witness who saw the perpetrator shoot the witness's companion twice and who the perpetrator attempted to rape, saw the perpetrator's face from within inches), *overruled on other grounds by State v. Belanger*, 2009-NMSC-025, 146 N.M. 357, 210 P.3d 783; *cf. State v. Johnson*, 2004-NMCA-058, ¶ 23, 135 N.M. 567, 92 P.3d 13 (stating that the witness's certainty was tempered by "the absence of evidence that [he] saw any of the perpetrator's distinctive physical characteristics").

**{13}** Here, Victim had ample opportunity to get a good look at Defendant prior to the attack. During the attack, she had got a good enough look at him to recognize him from before and to identify his clothing and smell when he was two and ten feet away from her in her house. The accuracy of Victim's description of Defendant was verified

8

by her consistent identification of him, even prior to the in-court identifications. The timing of Defendant climbing Victim's fence, pushing the motorcycle in front of her house prior to the attack, as well as the time between the attack, Victim's 911 call and her immediate interview with the police, was within a twenty-four hour time frame. The suggestiveness of the in-court identifications, 81 and 197 days respectively later, are outweighed by the reliability of Victim's prior identifications of Defendant.

{14} Based on the evidence presented, the application of those facts to the *Patterson* factors and under the totality of the circumstances, we lack any basis to conclude that Victim's identifications were unreliable in this case, as a matter of law. Because the evidence was admissible, it was up to the jury to determine the weight to be given the evidence as well as the credibility of the witnesses who testified at trial. *See State v. Hughey*, 2007-NMSC-036, ¶ 16, 142 N.M. 83, 163 P.3d 470.

**B.     The *Patterson* Test Remains Valid**

{15} Defendant contends that the New Mexico Constitution provides greater due process protection than the federal constitution in the area of eyewitness identification. Defendant expresses concern that *Patterson*, which is based on the *Biggers/Manson* factors, does not incorporate unique concerns safeguarded by the New Mexico Constitution. *Manson v. Brathwaite*, 432 U.S. 98, 113-14 (1977); *Neil v. Biggers*, 409 U.S. 188, 196 (1972). Relying on the first prong of the *Gomez'* interstitial analysis,

9

Defendant essentially argues that *Mason* and *Biggers* are outdated and that there are other jurisdictions and several law review articles questioning the reliability of the *Biggers/Manson* factors because those factors do not take into account more recent scientific findings on eyewitness identification, therefore the federal analysis is flawed. *See State v. Gomez*, 1997-NMSC-006, ¶ 19, 122 N.M. 777, 932 P.2d 1. Defendant devotes a good portion of his brief in chief to his argument that New Mexico must update its test for witness identification to comport with a handful of other states that have so ruled.

{16}    Inherent in Defendant's argument that the New Mexico Constitution affords him greater due process protections is that his right to due process was violated when the district court denied his motion to suppress. Our review of Defendant's argument is de novo. *See Ramirez*, 2018-NMSC-003, ¶ 29. In *Ramirez*, our Supreme Court recently affirmed the use of the *Manson/Biggers* factors to eyewitness identifications and declined to conclude that such identification testimony is inherently problematic and an unreliable form of evidence. *See Ramirez,* 2018-NMSC-003, ¶ 34. Our Supreme Court noted that while *Manson* and *Biggers* set forth an approach to "determine whether due process requires suppression of an eyewitness identification[,]" *Perry v. New Hampshire*, 565 U.S. 228 (2012), clarified a crucial precondition in that approach: " 'due process concerns arise *only* when law

10

enforcement officers use an identification procedure that is *both* suggestive *and* unnecessary.' " *Ramirez*, 2018-NMSC-003, ¶ 31 (*quoting Perry*, 565 U.S. at 238-39 (emphasis added)). *Perry* further clarified that the due process review is focused on "improper police arrangement of the circumstances surrounding an identification[,]" not the general suspicions regarding the reliability of eyewitness testimony. *Perry*, 565 U.S. at 242. The *Ramirez* court also reminded us of *Flores*, which acknowledged "authority limiting suppression of in-court identifications to only those cases where the in-court identification follows an allegedly suggestive pretrial encounter that itself resulted from some type of government action." *Ramirez*, 2018-NMSC-003, ¶ 31 (internal quotation marks and citation omitted). Thus, the *Ramirez* court, again relying on *Perry,* quashed any suggestion that such identification testimony is "inherently problematic and [an] unreliable form of evidence." *Ramirez,* 2018-NMSC-003, ¶¶ 34-35.

{17}     Defendant is not claiming that the photo lineup Victim was shown was improper. Rather Defendant is arguing: (1) Victim's self-reported out-of-court identifications are subjective and cannot be objectively tested, therefore such identifications are impermissibly suggestive; and (2) Victim's in-court identifications of Defendant 81 days and 197 days after the incident, in a jail uniform and at counsel table, are also highly suggestive. Because there was no improper law enforcement

identification procedure that was both suggestive and unnecessary, there is no violation of Defendant's right to due process. *See id.* ¶ 33 (stating that "[i]t is only when law enforcement are the source of the taint that due process concerns arise"). We therefore decline to address Defendant's argument that he would be afforded more due process protections for witness identification under New Mexico's constitution. *See Cheadle*, 1983-NMSC-093, ¶ 15 (noting that once the eyewitness in-court identification evidence is determined to be admissible, it is then for the jury to decide the accuracy of the witness' identification).

**{18}** More importantly, this Court is bound by our Supreme Court's precedent, particularly when, as in this case, the specific issue has been decided by our Court. *See State ex rel. Martinez v. City of Las Vegas*, 2004-NMSC-009, ¶ 20, 135 N.M. 375, 89 P.3d 47 (stating that this Court is bound by Supreme Court precedent); *State v. Duarte*, 2004-NMCA-117, ¶ 11, 136 N.M. 404, 98 P.3d 1054 (noting that "we are given more latitude when the precise issue has not been already decided by our Supreme Court"). *Ramirez* signals to this Court that the *Patterson* factors are still in play. Until the Supreme Court instructs otherwise, *Patterson* controls our inquiry and this Court is not at liberty to deviate. Given the strong indications of reliability with respect to the witness identification in this case, and the absence of the type of especially suggestive situations present in cases cited by Defendant, we do not agree

with Defendant's claim that our current test is inadequate as to the case before us. *See, e.g.*, *Johnson*, 2004-NMCA-058, ¶ 27 (deciding that in-court identification was tainted by highly suggestive show-up identification and unreliable witness identification at the show-up); *see also Patterson*, 2001-NMSC-013, ¶¶ 21, 32 (concluding that the failure of witnesses to positively identify the suspect and the suggestive nature of the show-up procedure, where headlights were turned on and directed at the suspect were not outweighed by the indicia of reliability).

{19}    Based on the foregoing, we conclude that it was not error for the district court to deny Defendant's motion to suppress the witness identification in this case.

**C.    Refusal of Defendant's Requested Jury Instruction on Eyewitness Identification**

{20}    Defendant submitted a lengthy instruction on eyewitness identification evidence, based on his expert witness's testimony outlining various theories and referring to research regarding identification, and including directions to the jury on how to view and weigh the evidence. The district court refused the instruction and substituted an instruction in its place containing the *Patterson* factors.

{21}    "The propriety of jury instructions given or denied is a mixed question of law and fact. Mixed questions of law and fact are reviewed de novo." *State v. Salazar*, 1997-NMSC-044, ¶ 49, 123 N.M. 778, 945 P.2d 996. Jury instructions are "proper if they . . . accurately state the applicable law." *State v. Cabezuela*, 2011-NMSC-041,

13

¶ 21, 150 N.M. 654, 265 P.3d 705. This Court reviews the denial of the defendant's tendered instruction for reversible error. *See State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. We must determine "whether a reasonable juror would have been confused or misdirected by the jury instruction." *Id.* (internal quotation marks and citation omitted).

{22}    The definitional jury instruction tendered by Defendant and based on New Jersey law, does not adequately reflect our state law, and in particular, does not reflect the law in the cases discussed in this opinion, including *Patterson* and *Baca*. Additionally, the nearly three page long tendered instruction based on New Jersey case law and its model jury instruction could be considered confusing for a reasonable juror, and therefore, was properly refused. *See State v. Lucero*, 1994-NMCA-129, ¶ 25, 118 N.M. 696, 884 P.2d 1175. Finally, the failure to give a definitional instruction is not the same as the omission of an essential element, and does not amount to reversible error or to fundamental error. *See State v. Mascareñas*, 2000-NMSC-017, ¶ 19, 129 N.M. 230, 4 P.3d 1221; *see also State v. Barber*, 2004-NMSC-019, ¶ 20, 135 N.M. 621, 92 P.3d 633.

{23}    The one page instruction given to the jury itemized the *Patterson* factors to consider when determining the reliability of an eyewitness identification, and also instructed that the State was required to prove the identity of the person who

14

committed the crime beyond a reasonable doubt. *See Patterson*, 2001-NMSC-013, ¶ 20; *State v. Sanders*, 1950-NMSC-062, ¶ 16, 54 N.M. 369, 225 P.2d 150 (noting that the trial court may substitute a requested instruction for one of the court drafts).

{24}     The instruction drafted by the district court follows the law in New Mexico. As for the theories included in Defendant's proposed instruction, he was free to present that argument to the jury. The district court did not err in refusing Defendant's requested instruction.

**D.     Instruction on Aggravated Battery**

{25}     Defendant claims that the instruction to the jury on the charge of aggravated battery was misleading where the "elements found by the jury only [fit] the crime of fourth-degree aggravated assault with a deadly weapon." Defendant concedes that his attorney did not object to the instruction. If the issue was not preserved, "we review for fundamental error." *Benally*, 2001-NMSC-033, ¶ 12. Under this standard, we must determine "whether a reasonable juror would have been confused or misdirected by the jury instruction." *Id.* (internal quotation marks and citation omitted). A juror may be confused even if the instruction is straightforward on its face, when the instruction does not provide an accurate rendition of the law. *See id.*

{26}     According to Defendant, the instruction only required the jury to find that Defendant "tried" to stab Victim, which Defendant claims cannot constitute a battery.

In actuality, the instruction requires the jury to find that Defendant "touched or applied force" to Victim "by trying to stab her with a deadly weapon." "Aggravated battery consists of the unlawful touching or application of force to the person of another with intent to injure that person or another." NMSA 1978, § 30-3-5(A) (1969). There was evidence that Defendant used a military-type knife while trying to subdue Victim, and Victim sustained cuts. The jury instruction accurately stated the law. In addition, the jury instruction provided would not have misled or confused a reasonable juror. We conclude it was not error for the district court to provide the jury with the instruction on the charge of aggravated battery, as written.

**II.      CONCLUSION**

{27}     For the forgoing reasons, we affirm Defendant's convictions.

{28}     **IT IS SO ORDERED.**

_____

**M. MONICA ZAMORA**

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Judge**

_____
**J. MILES HANISEE, Judge**

16