2001-NMSC-013

21 P.3d 1032

**Marvin PATTERSON, Petitioner,**

v.

**Tim LeMASTER, Warden, Respondent.**

No. 26,075.

Supreme Court of New Mexico.

April 3, 2001.

Marc H. Robert, P.C., Marc H. Robert, Albuquerque, NM, for Petitioner.

Patricia A. Madrid, Attorney General, Patricia Gandert, Assistant Attorney General, Santa Fe, NM, for Respondent.

## OPINION

MINZNER, Justice.

{1} Petitioner Marvin Patterson pleaded no contest to one count of armed robbery with a firearm enhancement, see NMSA 1978, § 30–16–2 (1973) and NMSA 1978, § 31–18–16 (1993), in the Second Judicial District Court and was convicted. Having exhausted his direct appeals, he petitioned for a writ of habeas corpus pursuant to Rule 5–802 NMRA 2001, claiming ineffective assistance of counsel. The district court denied his petition. We review the district court's decision pursuant to Rule 12–501 NMRA 2001.

{2} Petitioner advances two arguments on appeal. First, he argues that the State denied him effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article II, Section 14 of the New Mexico Constitution. Second, he argues that the State's unconstitutional denial of his right to effective assistance of counsel rendered his plea involuntary and therefore invalid.

{3} We hold that the State denied Petitioner his right to effective assistance of counsel under the federal constitution. We therefore reverse the district court's denial of his petition for a writ habeas corpus. We do not reach Petitioner's second argument.

## I.

{4} An armed, masked man robbed the Cooperage East restaurant the night of February 19, 1995. He held several employees at gunpoint, stole at least $5,000.00, and escaped through the back door and into the alley behind the restaurant.

{5} Eyewitness descriptions of the perpetrator were not consistent with each other. A cook told police the robber was an Hispanic man who was five feet, eight inches tall, weighed 135 to 140 pounds, wore tan clothes and a black and red ski cap, had a black cloth covering his face, and held a large automatic weapon that looked like a nine-millimeter pistol with a long clip. Another employee described the robber as a young, light-complected white or Hispanic male who was approximately five feet, nine inches tall, weighed approximately 160 pounds, wore a knitted black ski cap and thick tan coat, and wielded a large automatic weapon that resembled an Uzi. According to the assistant manager of the restaurant, the robber was an African American or Hispanic male in his early twenties who was approximately five feet, eight inches tall and weighed approximately 160 to 170 pounds, had a red bandana covering his face, wore black gloves, a brown khaki jacket, khaki pants, and a dark-colored ski hat, and carried a black automatic pistol, possibly a Tec nine millimeter, with a long banana clip. The on-duty manager described the robber as an African American or Hispanic male between the ages of twenty and thirty, who brandished "a machine gun type weapon" and wore a beige shirt, beige pants, and a black hat.

{6} The four eyewitnesses did not accurately describe Petitioner or his clothing the night of the robbery. Petitioner is African–American. Only two of the witnesses thought that the perpetrator might have been African–American; they were both unsure of his race, stating also that he might have been Hispanic. Petitioner stands five feet, nine inches tall and weighs approximately 165 pounds, which means that two of the four witnesses gave an estimate that roughly approximated his size. On the night he was arrested, Petitioner was holding a pair of black gloves and a tan shirt. Only

one of the four witnesses described black gloves. Only one witness described a tan shirt, although the other three described tan, khaki, or beige clothing of some kind. Petitioner was wearing tan pants, a grey sweatshirt, and a blue ski cap when he was arrested. Two of the four witnesses described tan or beige pants, and another described tan clothing. However, none of the witnesses mentioned a sweatshirt or correctly described the color of his ski cap.

{7} It is undisputed that Petitioner was in the alley around the time of the robbery, but according to Petitioner, he and a friend were there to purchase marijuana. Petitioner admits that he had a Tec twenty-two caliber handgun but claims he had it by coincidence and was not involved in the robbery. Petitioner asserts that his friend borrowed the gun a year earlier and that his friend returned it to him that night because his friend had a room inspection at Kirtland Air Force Base and was not authorized to have a gun in his room. According to Petitioner, he was standing in the alley, holding marijuana and a gun, when two or three people ran around the corner of the building followed by a car, and he fled because he was afraid. Petitioner testified that he tossed the marijuana as he ran, eventually stopped on the porch of a nearby house, and then wrapped his gun in his shirt. Petitioner lost his pursuers for a few minutes, but the police later found him on the porch, where they detained him, confiscated the Tec twenty-two caliber handgun, and found a red bandana. Petitioner did not have the stolen money, which was never recovered.

{8} The police then conducted a showup identification near the porch, bringing the assistant manager and the on-duty manager to the scene of the arrest, shining the headlights of the police vehicle on Petitioner, and asking the witnesses whether he was the perpetrator. The assistant manager positively identified Petitioner based on his clothing. The on-duty manager was unsure at first but later identified him as the perpetrator after the police had Petitioner put on another item of clothing.

{9} On August 8, 1995, a grand jury indicted Petitioner for one count of armed robbery, see § 30–16–2, eight counts of aggravated assault, see NMSA 1978, § 30–3–2(A) (1963), six counts of false imprisonment, see NMSA 1978, § 30–4–3 (1963), and two counts of tampering with evidence, see NMSA 1978, § 30–22–5 (1963). Fifteen of those counts included mandatory one-year firearm enhancements. See § 31–18–16. Petitioner faced a fifty-year sentence if convicted on all seventeen counts and all fifteen firearm enhancements.

{10} An assistant public defender represented Petitioner and advised him to plead no contest just before trial, despite Petitioner's insistence that he wanted to go to trial because he was innocent. The written plea agreement, which was filed May 17, 1996, stated that Petitioner would receive a sentence of one to fifteen years for pleading no contest to five counts: one count of armed robbery with a firearm enhancement, two counts of aggravated assault with a deadly weapon, one count of false imprisonment, and one count of tampering with evidence. Petitioner filed a motion to withdraw his plea on July 10, 1996, arguing that he did not enter his plea knowingly and voluntarily. The district court denied the motion. Although the written plea agreement indicates that Petitioner was to plead no contest to the five counts listed above, Petitioner pled no contest to only one count, armed robbery with a firearm enhancement, because the district court inadvertently failed to take his plea on the other four. The district court judge sentenced Defendant to ten years in prison, the standard nine years for armed robbery and the mandatory one year for a firearm enhancement.

{11} Petitioner appealed the denial of his motion to withdraw his plea. The Court of Appeals affirmed Petitioner's conviction. See State v. Patterson, No. 18,530, slip op. (NMCA Oct. 3, 1997). This Court denied his petition for writ of certiorari on November 19, 1997.

{12} The petition for a writ of habeas corpus was filed in the district court on November 12, 1998. Petitioner asserted that he was denied effective assistance of counsel because his attorney: (1) did not move to suppress the showup identifications, (2) failed

to investigate the physical evidence, and (3) did not advise him adequately about the possible sentences he faced under the plea agreement. Petitioner also argued that his plea was involuntary.

{13} The district court denied the petition for writ of habeas corpus on November 12, 1998. The district court made no findings with respect to Petitioner's claim that trial counsel's failure to move to suppress the showup identifications was ineffective assistance. Instead, the court concluded only that the claim "is tenuous at best under the circumstances of this case."

{14} We granted certiorari to review the district court's denial of the petition for writ of habeas corpus. We set forth the appropriate standard of review for such cases in *Duncan v. Kerby*, 115 N.M. 344, 347–48, 851 P.2d 466, 469–70 (1993):

> When this Court addresses the propriety of a lower court's grant or denial of a writ of habeas corpus based on ineffective assistance of counsel, findings of fact of the trial court concerning the habeas petition are reviewed to determine if substantial evidence supports the court's findings. Questions of law or questions of mixed fact and law, however, including the assessment of effective assistance of counsel, are reviewed de novo.

(internal citations omitted); *accord Churchman v. Dorsey*, 1996–NMSC–033, ¶ 10, 122 N.M. 11, 919 P.2d 1076 (1996).

## II.

{15} Petitioner advances three arguments in support of his ineffective assistance claim, one of which is that trial counsel was ineffective in failing to move to suppress the two showup identifications. Because we agree with Petitioner on this point, we do not reach his other arguments.

{16} The Sixth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, guarantees not only the right to counsel but "the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).[1] The purpose of guaranteeing effective assistance of counsel is to ensure fairness throughout the course of a criminal case. *See Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985); *Strickland v. Washington*, 466 U.S. 668, 684–85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Accordingly, a defendant has the right to effective assistance during all critical stages in the proceedings "after the initiation of formal charges," *Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), including plea negotiations, *see Hill*, 474 U.S. at 58, 106 S.Ct. 366. Effective assistance of counsel is necessary during plea negotiations because the most important decision for a defendant in a criminal case is generally whether to contest a charge or enter into a plea agreement. *See United States v. Gordon*, 156 F.3d 376, 380 (2d Cir.1998).

{17} "A prima facie case of ineffective assistance is made by showing that defense counsel's performance fell below the standard of a reasonably competent attorney and, due to the deficient performance, the defense was prejudiced." *State v. Dartez*, 1998–NMCA–009, ¶ 26, 124 N.M. 455, 952 P.2d 450 (internal quotation marks and quoted authority omitted). We refer to the two prongs of this test as the reasonableness prong and the prejudice prong. When applying the reasonableness prong, we do not second guess defense counsel's strategic decisions. *See Churchman*, 1996–NMSC–033, ¶ 18, 122 N.M. 11, 919 P.2d 1076. We apply the same test for reasonableness regardless of whether the defendant was convicted at trial or on a plea.

{18} However, the prejudice prong of the test is different for defendants convicted at trial than for defendants whose convictions rest on pleas. A defendant convicted at trial must prove that trial counsel's unrea-

---

1. Our appellate courts have not decided whether Article II, Section 14 of the New Mexico Constitution affords defendants greater protection than the Sixth Amendment to the United States Constitution. *See State v. Woodruff*, 1997 NMSC 061, ¶ 17, 124 N.M. 388, 951 P.2d 605. Petitioner did not preserve his state constitutional claim under *State v. Gomez*, 1997 NMSC 006, ¶ 23, 122 N.M. 777, 932 P.2d 1, and our analysis is therefore limited to federal constitutional law.

sonable performance calls into doubt "the reliability of the trial results." *State v. Jacobs*, 2000–NMSC–026, ¶ 48, 129 N.M. 448, 10 P.3d 127. On the other hand, "[i]n the plea bargain context a defendant must establish that his counsel's performance was objectively unreasonable and that but for counsel's errors, he would not have pleaded guilty and instead gone to trial." *United States v. Martinez*, 169 F.3d 1049, 1052–53 (7th Cir.1999); *accord Hill*, 474 U.S. at 59, 106 S.Ct. 366; *Hale v. Lockhart*, 903 F.2d 545, 548–49 (8th Cir.1990). A defendant who was convicted on a plea is not required to prove that a trial would have resulted in acquittal. The question is whether "there is a reasonable probability" that the defendant would have gone to trial instead of pleading guilty or no contest had counsel not acted unreasonably. *State v. Brazeal*, 109 N.M. 752, 757, 790 P.2d 1033, 1038 (Ct.App.1990) (internal quotation marks and quoted authority omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 758, 790 P.2d at 1039 (internal quotation marks and quoted authority omitted).

## A.

▓ {19} In order to satisfy the reasonableness prong of the ineffective assistance of counsel test in this context, Petitioner must establish that the facts support the motion to suppress and that a reasonably competent attorney could not have decided that such a motion was unwarranted. *See State v. Martinez*, 122 N.M. 476, 485, 927 P.2d 31, 40 (Ct.App.1996). We address each part of the reasonableness prong in turn.

▓ {20} The first issue is whether the facts of this case support a motion to suppress the showup identification. Due process requires that showup identifications be reliable under the totality of the circumstances to be admissible. *See Manson v. Brathwaite*, 432 U.S. 98, 113–14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 196, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Maes*, 100 N.M. 78, 82, 665 P.2d 1169, 1173 (Ct.App.1983). When assessing the reliability of a showup identification, courts weigh the "corrupting effect of the suggestive identification" against the wit-

ness's opportunity to view the criminal at the time of the crime, the attention the witness paid, the accuracy of any pre-identification description, the witness's level of certainty at the identification, and the time between the crime and the identification. *Manson*, 432 U.S. at 114, 97 S.Ct. 2243; *accord Neil*, 409 U.S. at 199–200, 93 S.Ct. 375.

▓ {21} Showup identifications are "inherently suggestive" and should be avoided. *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1265 (8th Cir.1996) (quoting *United States v. Sanders*, 547 F.2d 1037, 1040 (8th Cir.1976)). This showup identification was especially suggestive because the police spotlighted Petitioner using the headlights of a police vehicle while the witnesses were attempting to determine if he was the perpetrator of the robbery. *See State v. Padilla*, 122 N.M. 92, 97, 920 P.2d 1046, 1051 (Ct.App.1996) (noting that spotlighting a suspect tends to make a showup identification suggestive). Because the showup identifications were highly suggestive, they probably would have been inadmissible absent significant indicia of reliability.

{22} Having evaluated the suggestiveness of the showup identifications, we must ask whether there are sufficient indicia of reliability to outweigh the suggestiveness of the procedure followed in this case. We determine the reliability of the showup identifications using the applicable *Manson–Neil* factors.

{23} One factor is the opportunity the witnesses had to view the perpetrator. *See Manson*, 432 U.S. at 114, 97 S.Ct. 2243; *Neil*, 409 U.S. at 199, 93 S.Ct. 375. Most of the perpetrator's face and head were covered throughout the robbery. Several witnesses stated that a bandana masked his face and that a stocking cap concealed his hair. The witnesses who identified Petitioner as the perpetrator therefore had a very limited view of the perpetrator's face and head; his most distinctive physical characteristics were not visible to them. This factor weighs against the reliability of the showup identifications. *See Padilla*, 122 N.M. at 97, 920 P.2d at 1051 (noting that showup identification lacked reli-

ability where witness had no opportunity to see the perpetrator's face).

{24} A second factor is the accuracy of the pre-identification descriptions the witnesses gave. *See Manson*, 432 U.S. at 114, 97 S.Ct. 2243; *Neil*, 409 U.S. at 199, 93 S.Ct. 375. Petitioner is African–American, and only one of the two witnesses identified the perpetrator as African–American prior to the showup identification.[2] The other witness described the perpetrator as Hispanic. A description of the race of the perpetrator that does not match the race of the defendant casts doubt on the reliability of the subsequent showup identification. *See United States v. de Jesus-Rios*, 990 F.2d 672, 678 (1st Cir.1993) (holding that showup identification should have been suppressed where witness's description of the perpetrator's race did not accurately describe the defendant's race). The witness whose description of the perpetrator's race did not match Petitioner's race accurately described Petitioner's height as "about five foot eight" and his weight as "about 160 pounds." However, only one of the two witnesses at the showup gave an estimate of the perpetrator's age that roughly approximated Petitioner's age at the time of the robbery. Neither of the two witnesses at the showup described any other physical characteristic of the perpetrator. The only other descriptions the witnesses gave were of items of clothing. Those items included khaki or beige pants, a brown khaki jacket, a beige shirt, and a black or dark-colored ski cap. Although these descriptions are generally consistent with Petitioner's clothing, descriptions of common items of clothing like these do not greatly increase reliability, especially when those descriptions are incomplete and partially inaccurate. The witnesses described tan or beige items of clothing and a ski cap, but these garments are too common to increase the reliability of these identifications. A roughly accurate approximation of a suspect's height, weight, and age, and a description of generic items of clothing might bolster an otherwise accurate and detailed description, thereby indicating that a showup identification is reliable. However, both of these pre-identification descriptions are very sketchy. In addition, one contains an especially significant inaccuracy; one witness described the perpetrator as Hispanic, but Petitioner is African–American. It follows that these pre-identification descriptions do not buttress the reliability of the showup identifications.

{25} The last two relevant factors are the time between the crime and the identification and the witness's level of certainty at the identification. *See Manson*, 432 U.S. at 114, 97 S.Ct. 2243; *Neil*, 409 U.S. at 199–200, 93 S.Ct. 375. Although little time elapsed between the crime and the identifications, one of the two witnesses at the showup failed to positively identify Petitioner as the perpetrator quickly. He hesitated and was unable to make the identification until the police made the Petitioner put on an additional piece of clothing. The witness was uncertain at the outset, and his identification relied not on Petitioner's physical characteristics but instead on his clothing, none of which was distinctive. The final two factors do not indicate that the identifications were reliable.

{26} Having applied the *Manson–Neil* factors, we conclude that the showup procedure was suggestive and that the identifications probably lacked the indicia of reliability necessary to outweigh the suggestiveness of that procedure. It is likely that there was factual support for a motion to suppress the identifications.

{27} The next step in determining whether counsel's performance was unreasonable for Sixth Amendment purposes is to ask whether a reasonably competent attorney could have decided that a motion to suppress was unwarranted even though the facts might have supported it. *See Martinez*, 122 N.M. at 485, 927 P.2d at 40. The record does not include any facts which might have led a reasonably competent attorney not to file a motion to suppress. There was no strategic reason for a reasonably competent attorney who was aware of the facts of this case and the governing

---

2. Only one of the witnesses at the showup described the perpetrator as African American prior to identifying him; the other described him as Hispanic prior to the showup and only later said that he may have been African American.

case law not to try to suppress the showup identifications, which were a vital part of the State's case against Petitioner. We believe a reasonably competent attorney could not have decided that a motion to suppress was unwarranted under these circumstances. We therefore conclude that counsel's performance was unreasonable for Sixth Amendment purposes and that Petitioner has satisfied the first prong of the ineffective assistance of counsel test.

## B.

▉ {28} Having established that counsel's performance fell below an objective standard of reasonableness, we must now determine whether Petitioner suffered prejudice as a result. We reiterate that in order to satisfy the prejudice prong, it is necessary to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," see *Brazeal*, 109 N.M. at 757–58, 790 P.2d at 1038–39 (Ct.App.1990) (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052), and that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 758, 790 P.2d at 1039 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). The question is therefore whether there is a reasonable probability that Petitioner would have chosen to go to trial instead of pleading no contest had defense counsel moved to suppress the showup identifications.

[17] {29} Because courts are reluctant to rely solely on the self-serving statements of defendants, which are often made after they have been convicted and sentenced, a defendant is generally required to adduce additional evidence to prove that there is a reasonable probability that he or she would have gone to trial. See *Turner v. Tennessee*, 858 F.2d 1201, 1206 (6th Cir.1988), *vacated on other grounds*, 492 U.S. 902, 109 S.Ct. 3208, 106 L.Ed.2d 559 (1989); *Johnson v. Duckworth*, 793 F.2d 898, 902 n. 3 (7th Cir.1986); *Lloyd v. State*, 258 Ga. 645, 373 S.E.2d 1, 3 (1988); *Williams v. State*, 326 Md. 367, 605 A.2d 103, 109–10 (1992); *see generally* 3 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 11.10(d) (1999). We have identified two types of additional evidence that are pertinent to the analysis in this case.

▉ {30} First, a defendant's pre-conviction statements or actions may indicate whether he or she was disposed to plead or go to trial. See *Lewandowski v. Makel*, 949 F.2d 884, 889 (6th Cir.1991); *United States v. Zelinsky*, 689 F.2d 435, 438 (3d Cir.1982); *Rasmussen v. State*, 280 Ark. 472, 658 S.W.2d 867, 868 (1983); *Williams*, 605 A.2d at 109–10. In this case, Petitioner insisted on his innocence throughout the process and repeatedly expressed his desire to go to trial. Despite Petitioner's statements, his trial counsel advised him to plead no contest because the evidence against him would probably support a conviction at trial. However, as discussed above, defense counsel failed to move to suppress the showup identifications of the State's two key identification witnesses. Petitioner's insistence on his innocence and his desire to challenge the charges against him at trial indicate that there is a reasonable probability that Petitioner would have chosen to go to trial instead of pleading no contest had trial counsel moved to suppress the showup identifications.

▉ {31} Second, we consider the strength of the evidence against a defendant. Courts consider the strength of the evidence against a defendant in determining whether the prejudice prong has been met in cases that go to trial. See *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir.1999) ("It is firmly established that a court must consider the strength of the evidence in deciding whether the *Strickland* prejudice prong has been satisfied."); *see also United States v. Prows*, 118 F.3d 686, 692–93 (10th Cir.1997). We consider the strength of the evidence when the conviction rests on a plea because the evidence against a defendant informs his or her decision about whether to challenge the charges at trial. There is a direct relationship between the strength of the case against a defendant and the likelihood that he or she will plead guilty or no contest. As the strength of the evidence increases, so does the likelihood that a defendant will accept a plea offer instead of going to trial. We emphasize that the purpose of evaluating the

evidence is to determine whether there is a reasonable probability that the defendant would have chosen to go to trial had counsel's performance not been deficient, not to predict the outcome of a trial had defendant chosen to go to trial.

{32} We turn now to the evidence in this case, where the key issue was the identity of the perpetrator. There was a great deal of inconsistency among the witnesses's descriptions of the perpetrator, and many of those descriptions did not accurately describe the Petitioner's basic physical characteristics. Moreover, witnesses gave only generic descriptions of the perpetrator's clothing. In addition, the perpetrator stole a large quantity of money during the robbery, but Petitioner did not have any of the stolen money in his possession just minutes after the robbery occurred. The strongest parts of the State's case were showup identifications made by two witnesses who never had a good opportunity to see the perpetrator's face and who were asked whether the lone man standing in the glare of the headlights of a police car had robbed them. Given that the case against Petitioner depended in large part on these showup identifications, a successful motion to dismiss would have weakened the State's case dramatically, thereby strengthening Petitioner's defense and making it more likely that Petitioner would have opted to go to trial instead of pleading no contest.

{33} Although we recognize that counsel need not file every motion in order to provide constitutionally effective assistance, *see Brazeal,* 109 N.M. at 757, 790 P.2d at 1038, this motion was crucial because it could have excluded key evidence. Taken together, the evidence against Petitioner and his statements prior to his no contest plea undermine our confidence that Petitioner would have pled no contest had counsel's performance not been deficient. Because there is a reasonable probability that Petitioner would have gone to trial instead of pleading no contest had counsel moved to suppress the showup identifications, we hold that counsel's deficient performance prejudiced Petitioner.

### III.

{34} Petitioner has established that counsel's failure to move to suppress the showup identifications fell below the constitutional standard of reasonableness and that he suffered prejudice as a result. We hold that Petitioner was denied his right to effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. Accordingly, we reverse the district court's denial of the petition for a writ of habeas corpus, set aside Petitioner's no contest plea, vacate his conviction and sentence, and remand to the district court for proceedings consistent with this opinion.

{35} **IT IS SO ORDERED.**

WE CONCUR: GENE E. FRANCHINI, Justice, PETRA JIMENEZ MAES, Justice.

PATRICIO M. SERNA, Chief Justice (dissenting).

JOSEPH F. BACA, Justice (dissenting).

SERNA, Chief Justice (dissenting).

{36} I respectfully dissent. The majority purports to apply the Sixth Amendment as that provision applies to the States through the Fourteenth Amendment. The majority correctly describes the prejudice prong of the test for ineffective assistance of counsel in cases involving pleas as whether there is a reasonable probability that the defendant would not have pleaded guilty, or no contest, and would have instead gone to trial. However, the majority asserts that "the prejudice prong of the test is different for defendants convicted at trial than for defendants whose convictions rest on pleas." *Majority Opinion* ¶ 17. The majority then states, "A defendant who was convicted on a plea is not required to prove that the result at trial would have been acquittal." *Id.* I respectfully disagree. This Court is not free to interpret the Sixth Amendment in any manner it chooses, and I believe that the majority's analysis conflicts with the standard established by the United States Supreme Court. The Supreme Court has specifically addressed the prejudice standard for ineffective assistance claims involving a plea and has explained the similarities between that stan-

dard and the one articulated in *Strickland* for cases involving a trial:

> In many guilty plea cases, *the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial.* For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction *whether the evidence likely would have changed the outcome of a trial.*

*Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (emphasis added). I believe that the majority's articulation of the prejudice standard directly conflicts with *Hill.*

{37} Respectfully, I also believe that the majority's mistaken articulation of the standard results in a misapplication of the prejudice prong to the facts of this case. The majority recognizes that although Petitioner repeatedly asserted his innocence he nonetheless followed the advice of his counsel to plead no contest to the charges. *Majority Opinion* ¶ 30. Despite this recognition, the majority does not focus on trial counsel's recommendation. Specifically, the majority fails to determine that trial counsel's recommendation would have been altered by a successful motion to suppress the showup identifications. Given Petitioner's willingness to follow the advice of his counsel even over his own protestations of innocence, the failure to make this determination is fatal to the majority's analysis. The Supreme Court clearly explained in *Hill* that the proper focus under these circumstances is whether a successful motion to suppress the showup identifications "would have led counsel to change [her] recommendation as to the plea," *Hill,* 474 U.S. at 59, 106 S.Ct. 366.

{38} Trial counsel rendered her advice to Petitioner to plead no contest based on her investigation of the State's evidence, her interviews with the potential witnesses, and her assessment of her client's credibility if he testified before a jury. Trial counsel's assessment of the case went far beyond the two show-up identifications. Trial counsel was justifiably concerned about Petitioner's presence at the scene of the crime, his possession of a gun that was similar to the one described by the eyewitnesses, and the similarity between the clothing he was wearing and the clothing described by the eyewitnesses, including the color of the clothing and the type of clothing, such as the ski cap, a red bandana, and black gloves. Moreover, if this case went to trial, a jury would be entitled to infer a consciousness of guilt from Petitioner's flight from the restaurant. The majority's assertion to the contrary notwithstanding, the showup identifications were not critical to the State's case.

{39} In denying the petition for writ of habeas corpus, the district court noted that, based on interviews with the witnesses, trial counsel "testified that she was concerned about the witnesses' ability to identify the defendant because of the type of clothing he was wearing. She felt that the State's case was very strong. She then counseled the Petitioner about the trial option and as a result the defendant entered a negotiated plea." The district court further noted that "trial counsel's responsibility to her client was to assess the totality of the evidence that would go to the jury. A strong positive identification by numerous witnesses is what trial counsel feared." The majority fails to determine that these factual findings are unsupported by substantial evidence. As found by the district court, trial counsel's recommendation was based on the totality of evidence and not solely on the showup identifications. Even without the showup identifications, a jury would have been presented with a number of sympathetic witnesses describing an assailant who substantially matched Petitioner's appearance on the night in question, in addition to Petitioner's admitted presence at the scene, compared to Petitioner's highly unlikely, self-serving, uncorroborated story that he was in an alley behind the restaurant at the exact time that an individual meeting his description com-

mitted the robbery.[1] Under these circumstances, the suppression of the showup identifications would not change the outcome of a trial, and it is therefore highly unlikely that trial counsel would have changed her recommendation to plead no contest even if she had successfully moved to suppress the showup identifications. Under the standard articulated by the Supreme Court in *Hill*, by which we are bound, Petitioner has failed to demonstrate prejudice in this case. For these reasons, I respectfully dissent.

I CONCUR: JOSEPH F. BACA, Justice.

1. The majority focuses on the fact that no money was found on Petitioner. However, to a jury, given the other evidence against Petitioner, this fact would likely have been less important than the fact that there were no witnesses or any marijuana found by the police to support Petitioner's story. If, under Petitioner's story, he could successfully discard the marijuana without detection, he would also have had an opportunity to successfully hide the money.