147 P.3d 897 (2006)
2006-NMCA-141
STATE of New Mexico, Plaintiff-Appellee,
v.
Roberto CARLOS, Defendant-Appellant.
No. 25,982.
Court of Appeals of New Mexico.
October 3, 2006.
Revised December 11, 2006.
*898 Patricia A. Madrid, Attorney General, Santa Fe, NM, Steven S. Suttle, Assistant Attorney General, Albuquerque, NM, for Appellee.
Lilley Law Offices, Lawrence W. Allred, Michael W. Lilley, Las Cruces, NM, for Appellant.

OPINION
SUTIN, Judge.
{1} Our Supreme Court has held that a criminal defense attorney must advise his or her client "of the specific immigration consequences of pleading guilty[.]" State v. Paredez, 2004-NMSC-036, ¶ 19, 136 N.M. 533, 101 P.3d 799. Defendant appeals the denial of his motion to withdraw his guilty plea, arguing that his plea was involuntary due to ineffective assistance of counsel under the standard enunciated in Paredez. We agree and we reverse for the district court to conduct further proceedings and to determine whether Defendant was prejudiced.
BACKGROUND
{2} Defendant, a permanent resident alien, was charged with battery against a household member, false imprisonment, and criminal damage to property. See NMSA 1978, § 30-3-15 (2001) (battery against a household member); NMSA 1978, § 30-4-3 (1963) (false imprisonment); NMSA 1978, § 30-15-1 (1963) (criminal damage to property). He pleaded guilty to the charges of false imprisonment and battery against a household member. In exchange, the State dismissed the charges of criminal damage to property and the State agreed not to oppose a suspended sentence. The plea agreement contained the following sentence: "I understand that entry of this plea agreement may have an effect upon my immigration or naturalization status." The record does not contain any recitation of the facts underlying the crimes to which Defendant pleaded guilty.
{3} After sentencing, the federal government initiated immigration removal proceedings against Defendant. Defendant then *899 filed a motion to withdraw his guilty plea, asserting that his defense attorney did not inform him of the likelihood of removal if he pleaded guilty to the charge of false imprisonment. The district court denied his motion without an evidentiary proceeding. Defendant appealed. While his appeal was pending, our Supreme Court decided Paredez, which set forth the test for determining whether advice to a defendant regarding immigration consequences is sufficient assistance of counsel. 2004-NMSC-036, ¶ 19, 136 N.M. 533, 101 P.3d 799. Based on Paredez, we remanded the case in a memorandum opinion for an evidentiary hearing, instructing the district court to determine whether the standard announced in Paredez was met.
{4} At the evidentiary hearing, Defendant testified that his attorney never discussed the possible immigration consequences of a conviction or guilty plea on the charges against him. He also testified that he did not have time to read the plea agreement before signing it because the judge was going to call his case, so he did not read the sentence in the agreement stating that he understood that the agreement may have an effect on his immigration status. Defendant further testified that he would not have pleaded guilty to the charges had he known that he could have been deported. In addition, he testified that although he was born in Mexico, he was brought to the United States right after his birth, and has lived in the United States all of his life. Further, Defendant also testified to the effect that prior to accepting the plea agreement he told his attorney that he did not commit false imprisonment, but he pleaded guilty because she told him he would just get probation.
{5} The attorney testified that she never would have asked a client to sign a plea and disposition agreement without reading it and that she did not do so in the present case. She testified that through paperwork and discussions with Defendant she learned that he was a Mexican national living in the United States legally, and she testified that she discussed possible immigration consequences with Defendant. More specifically, the testimony was as follows:
[State:] Now, specifically regarding advising clients of immigration consequences, what  do you recall specifically the case of Roberto Carlos and what you talked to him about regarding immigration?
[Attorney:] I gave all of the people who had immigration consequences the same discussion and the same information. Basically the first question after establishing their nationality and whether they were subject to immigration proceedings of any kind, I would ask them, has immigration been in contact with you? Have they sent you a letter? Have they come to your employer? Have they gone to your house? Have they asked to see you? And if they say no, which a majority  a lot of them do, especially who are legal permanent residents, I say well just because nobody has been in touch with you doesn't mean that they won't be. And I explain to them the range of different things that could happen, ranging from a paper review to a case being called in and explaining basically the process all the way through a deportation proceeding.
. . . .
[State:] Now as far as it pertains specifically to Mr. Carlos, do you recall specifically going over those things that you would normally do?
[Attorney:] I can't say when I did it, I can't say what month or what day, but I do know that because he fit into that category of potential immigration issues that he would have gotten my standard discussion and the explanation of what the procedure is.
. . . .
[State:] [D]id you know specifically what immigration consequences Mr. Carlos could be facing or was likely to be facing?
[Attorney:] Well, I think in terms of that you can only speak of likelihood, because nobody knows what immigration is ultimately going to do. There's a lot of factors that add in, in terms of the proceedings per se. I think that the best thing to do, and again this was the policy of the [public defender's] department at the time, to give people the whole gamut of what could be expected and what is likely to *900 happen. Our position was that we would tell everybody as if this was going to go to a full blown immigration case and to advise them what can happen along the way.
{6} On cross-examination, the attorney further testified as follows:
[Defense:] [Y]ou tell everybody, . . . not people here illegally, people in Robert's situation where they are here legally right now but they're not American citizens, what is it you tell every single one of them?
[Attorney:] I tell them that they could be subject to deportation proceedings, that their paperwork or their status is reviewed by immigration, that a decision is made on how to proceed, that more likely than not it ends up in some type of formal proceeding where immigration would look at whether they would be allowed to stay in the United States if there is a conviction of any point. I also go into a brief explanation of what a deportation proceeding involves, I tell people that they're entitled to have an attorney represent them, that that is not our job as public defenders, and that we do not pretend to know immigration law, and that their best advice would be also to consult or to talk with other people regarding that. But there are certain factors that immigration could look at, and that certainly how this case bears out could have an effect on what immigration would ultimately decide.
. . . .
[Defense:] [S]pecific to Robert Carlos, what did you do to determine whether false imprisonment is a crime that subjected him to deportation if he was convicted of it?
[Attorney:] Well, it wasn't a question that I did an individual analysis with anyone because at that time they were deporting people on the basis of felony DUIs, which has since been overturned. We treated everyone the same in the information that we gave. We told them what the consequences were, we told them what a deportation proceeding was about, we told them what their rights were, we told them in so many words about mitigating factors, we told them what we would do and we always left the decision after that to take a plea or go to trial up to the client.
{7} The district court denied Defendant's motion to withdraw his plea. The court found that Defendant's attorney "determined before the plea hearing that defendant was a Mexican national and a lawful permanent resident in the United States" and that the attorney "discussed in detail the defendant's immigration status with him including the consequences of his plea as was her habit in all cases involving aliens."
{8} Defendant appeals, arguing that, in violation of the standard enunciated in Paredez, his attorney failed to tell him of the specific consequences he would face for pleading guilty to false imprisonment or battery on a household member. Therefore, he argues, he received ineffective assistance of counsel, his plea was not knowing and voluntary, and he was prejudiced by the ineffective assistance of counsel. Defendant asserts on appeal that the district court must be reversed, he must be allowed to withdraw his plea agreement, the judgment and order should be vacated, and he should be allowed to proceed to trial.
DISCUSSION
Standard of Review
{9} A motion to withdraw a guilty plea is addressed to the sound discretion of the trial court, and we review the trial court's denial of such a motion only for abuse of discretion. The district court abuses its discretion in denying a motion to withdraw a guilty plea when the undisputed facts establish that the plea was not knowingly and voluntarily given.
Paredez, 2004-NMSC-036, ¶ 5, 136 N.M. 533, 101 P.3d 799 (internal quotation marks and citations omitted). "[T]he abuse-of-discretion standard does not preclude an appellate court from correcting errors premised on the trial court's misapprehension of the law[.]" State v. Barnett, 1998-NMCA-105, ¶ 13, 125 N.M. 739, 965 P.2d 323.
[A] trial court abuses its discretion when it . . . commits manifest error by accepting a plea that is not knowingly and voluntarily given. Where, as here, a defendant is represented by an attorney during the plea *901 process and enters a plea upon the advice of that attorney, the voluntariness and intelligence of the defendant's plea generally depends on whether the attorney rendered ineffective assistance in counseling the plea.
We afford de novo review of mixed questions of law and fact concerning the ineffective assistance of counsel.
Id. ¶¶ 12-13 (citations and footnote omitted).
The Constitutional Standards
{10} The Sixth Amendment guarantees the right to reasonably effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Effective assistance of counsel is necessary during plea negotiations." Patterson v. LeMaster, 2001-NMSC-013, ¶ 16, 130 N.M. 179, 21 P.3d 1032. The defendant bears the burden of establishing ineffective assistance of counsel. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052; Paredez, 2004-NMSC-036, ¶ 13, 136 N.M. 533, 101 P.3d 799; Patterson, 2001-NMSC-013, ¶ 17, 130 N.M. 179, 21 P.3d 1032. Where a defendant enters a plea upon advice of counsel, "the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." Hill v. Lockhart, 474 U.S. 52, 57, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (internal quotation marks and citation omitted); Paredez, 2004-NMSC-036, ¶ 13, 136 N.M. 533, 101 P.3d 799. In addition to showing that "counsel's representation fell below an objective standard of reasonableness[,]" a defendant must also show that "counsel's constitutionally ineffective performance affected the outcome of the plea process[,]" such that, were it not for counsel's errors, there was a reasonable probability that the defendant "would not have pleaded guilty and would have insisted on going to trial." Id. ¶¶ 14, 20 (internal quotation marks and citations omitted). In short, under Strickland, there is a two-prong test under which a defendant must show (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." Paredez, 2004-NMSC-036, ¶ 13, 136 N.M. 533, 101 P.3d 799 (internal quotation marks and citation omitted).
The Paredez Case
{11} In Paredez, the defendant, a permanent resident alien, pleaded guilty to criminal sexual contact of a minor in the third degree. Id. ¶¶ 1, 2. His attorney and the court advised him that the plea could affect his immigration status. Id. ¶ 2. The Supreme Court noted the applicable federal immigration statutes, namely, 8 U.S.C. § 1227(a) and (a)(2)(A)(iii) (2000), § 1101(a)(43)(A) (2000), and § 1229b(a)(3) (2000), which relate to (1) removal of aliens upon order of the attorney general when the class of deportable aliens includes those who are convicted of an "aggravated felony" such as sexual abuse of minor, and (2) whether the attorney general may cancel removal. Paredez, 2004-NMSC-036, ¶ 4, 136 N.M. 533, 101 P.3d 799. The Court construed these statutes as rendering the defendant's removal a virtual, if not automatic or certain consequence of his plea. Id. ¶¶ 4, 19, 25. That the Court so construed these statutes is borne out by the Court's following statements. The Court said that "the record reflects that [the d]efendant's attorney . . . may have failed to inform him that his guilty plea would result in his virtually automatic deportation." Id. ¶ 4. The Court also stated that criminal defense attorneys "must advise th[e] client of the specific immigration consequences of pleading guilty, including whether deportation would be virtually certain." Id. ¶ 19. And the Court held "that . . . [the d]efendant's attorney had an affirmative duty to . . . advise him that he almost certainly would be deported if he pleaded guilty." Id. ¶ 25.
{12} Having made the determination as to the specific immigration consequences the defendant was virtually certain to face, the Court in Paredez analyzed whether "an attorney's advice to the client that he or she `could' or `might' be deported would be misleading and thus deficient" where "a defendant's guilty plea almost certainly will result in deportation[.]" Id. ¶ 15. It is difficult not to conclude from the Court's analysis that defense counsel must study immigration law and make a determination whether the guilty plea will almost certainly result in deportation. Note the Court's quote from an Oregon *902 case: "[S]tating that a person `may' be subject to deportation implies there is some chance, potentially a good chance, that the person will not be deported. That is an incomplete and therefore inaccurate statement if made to an alien considering whether to plead guilty to an aggravated felony." Id. (citation omitted). Moreover, the Court specifically stated that, in many cases, giving no advice regarding immigration consequences would be no different than giving "general advice that a guilty plea `could,' `may,' or `might' have an effect on immigration status"  in each case "the defendant did not receive information sufficient to make an informed decision to plead guilty." Id. ¶ 17.
{13} Emphasizing that "deportation can often be the harshest consequence of a non-citizen criminal defendant's guilty plea," it is obvious that the Court in Paredez was not going to place the burden of knowing immigration law and the consequences of a plea of guilty on either the defendant or the district court. See id. ¶¶ 8, 12, 18, 25 (specifically not requiring more specificity by the district court than that required in Rule 5-303 NMRA, and stating that the district court did not err in its admonition to the defendant and, in fact, fulfilled its duty in informing the defendant that the guilty plea "could" affect his immigration status, although stating that it would have been prudent for the court to have been more specific, and also stating that the fact that the court did not err did not mean that defense counsel was relieved from the duty to advise the defendant that he would almost certainly be deported).
{14} Paredez does not indicate the depth of knowledge of immigration law and practice defense counsel must have in order to provide the advice the Court requires. However, it is difficult to read Paredez in any way other than stating a general rule that requires criminal defense counsel, after determining the immigration status of the defendant, to read and interpret federal immigration law and specifically advise the defendant whether a guilty plea will result in almost certain deportation. It is difficult to find in the Paredez analyses and holding much leeway for counsel's advice short of a definite prediction as to the likelihood of deportation based on the crimes to which a defendant intends to plead and the crimes listed in federal law for which a defendant can be deported. We again note that in Paredez the Court, itself, construed federal law and, under no uncertain terms, expressly stated a rule, holding that:
criminal defense attorneys are obligated to determine the immigration status of their clients. If a client is a non-citizen, the attorney must advise that client of the specific immigration consequences of pleading guilty, including whether deportation would be virtually certain. Proper advice will allow the defendant to make a knowing and voluntary decision to plead guilty.
Id. ¶ 19.[1] Under this rule, after itself construing federal law, and after rejecting advice that the defendant might or could be deported as ineffective, the Court then definitively stated and held that the defendant's counsel in Paredez "had an affirmative duty to determine his immigration status and provide him with specific advice regarding the impact a guilty plea would have on his immigration status." Id. ¶ 1 (emphasis added). We cannot ignore the careful analysis of the Paredez Court in reaching its conclusion. See Toscano v. Lovato, 2002-NMCA-022, ¶ 19, 131 N.M. 598, 40 P.3d 1042 (stating that the Court of Appeals "should abide by our Supreme Court's clear statement in a recent opinion that appears to have carefully considered the issue presented"), overruled on other grounds by Baker v. BP Am. Prod. Co., 2005-NMSC-011, 137 N.M. 334, 110 P.3d 1071.
The Present Case
{15} Although in the present case the district court found that Defendant's attorney "discussed in detail [D]efendant's immigration status with him including the consequences of his plea," the evidence was *903 uncontroverted that the attorney did not conduct an individualized analysis of the apparent immigration consequences for Defendant based on the actual charges to which he pleaded guilty. The only evidence in the record is that the attorney generally advised clients of the range of different things that could happen in the deportation proceedings, advised Defendant in general about the possible consequences of pleading guilty, and advised him of the utility of retaining counsel specifically to deal with the immigration issue. It is difficult to sustain this level of advice under the Paredez rule. That is, it is difficult to find in Paredez any indication that it would be acceptable in the present case to merely tell Defendant that deportation was a possible consequence. We read Paredez to require at a minimum that the attorney advise the defendant of the specific federal statutes which apply to the specific charges contained in the proposed plea agreement and of consequences, as shown in the statutes, that will flow from a plea of guilty.
{16} Thus, in the present case, as we read Paredez, Defendant's attorney should have discussed with Defendant the specific elements of the charges of battery against a household member and false imprisonment. See § 30-3-15 (stating that battery against a household member, a misdemeanor, "consists of the unlawful, intentional touching or application of force to the person of a household member, when done in a rude, insolent or angry manner"); § 30-4-3 (stating that false imprisonment, a felony, "consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so"). Further, the attorney at a minimum should have advised Defendant that, according to federal statutes, an "alien . . . shall, upon order of the Attorney General, be removed if . . . convicted of . . . [an][a]ggravated felony" or "a crime of domestic violence." See 8 U.S.C. § 1227(a)(2)(A)(iii), (a)(2)(E)(i) (2006). Further, the attorney should have explained the statutory definition of each of those crimes. See 8 U.S.C. § 1101(a)(43)(F) (2006) (defining an aggravated felony to include "a crime of violence (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment [is] at least one year" (footnote omitted)); § 1227(a)(2)(E)(i) (defining a crime of domestic violence as a crime of violence "against a person committed by a current or former spouse of the person, by an individual with whom the person shares a child in common, by an individual who is cohabiting with or has cohabited with the person as a spouse, by an individual similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs"); 18 U.S.C. § 16 (2006) (defining a crime of violence as "(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense"). In addition, the attorney should have analyzed and discussed with Defendant the federal statute relating to cancellation of removal, see 8 U.S.C. § 1229(b), as well as, perhaps, 8 U.S.C. §§ 1228(a) (removal of criminal aliens) and 1228(c) (presumption of deportability).
{17} The State subtly suggests that because Paredez's determinations were based on the Sixth Amendment of the United States Constitution, and not on independent state constitutional grounds, our Supreme Court in Paredez should have followed, but mistakenly failed to follow, the standard applied in Broomes v. Ashcroft, 358 F.3d 1251 (10th Cir.2004). In Broomes, the Tenth Circuit Court of Appeals concluded that counsel's failure to advise a defendant of immigration consequences is not a violation of the Sixth Amendment guarantee of effective assistance of counsel because immigration consequences are collateral consequences. Id. at 1257. Indeed, in deciding Paredez our Supreme Court explicitly recognized that the Tenth Circuit and other jurisdictions have not interpreted the Sixth Amendment to require counsel to advise non-citizen clients "of the specific immigration consequences of pleading guilty." 2004-NMSC-036, ¶¶ 15-19, 136 N.M. 533, 101 P.3d 799. We will not venture into this issue, because this Court *904 "follow[s] applicable precedents of our Supreme Court." State v. Travarez, 99 N.M. 309, 311, 657 P.2d 636, 638 (Ct.App.1983). Thus, we apply the Paredez standard in regard to counsel's advice as to specific immigration consequences, and as we read that standard Defendant has met the first prong of the test for ineffective assistance of counsel.
{18} In the present case, Defendant's attorney did not give Defendant that specific advice. Thus, the advice fell below the standard required by Paredez for effective assistance of counsel. Id. ¶¶ 15-19.[2]
{19} We turn now to the second prong of the Strickland test: whether the ineffective assistance of counsel prejudiced Defendant. Paredez, 2004-NMSC-036, ¶ 13, 136 N.M. 533, 101 P.3d 799. A non-citizen must show that he would not have entered the plea if he had been given constitutionally adequate advice as to the specific consequences of his plea, see id. ¶¶ 16, 19-20, together with a reasonable probability that he would have gone to trial instead of pleading guilty, see Patterson, 2001-NMSC-013, ¶ 18, 130 N.M. 179, 21 P.3d 1032.
{20} "[T]here are no mechanical rules for determining prejudice." Barnett, 1998-NMCA-105, ¶ 32, 125 N.M. 739, 965 P.2d 323. To establish prejudice, a defendant generally must introduce evidence beyond solely self-serving statements. Id. ¶ 29. Such evidence, for example, can include pre-conviction statements or actions indicating whether the defendant was disposed to plead or go to trial. Patterson, 2001-NMSC-013, ¶ 30, 130 N.M. 179, 21 P.3d 1032. Such evidence may also include "the strength of the evidence against a defendant." Id. ¶ 31. As we indicated earlier in this opinion, the record is bare with respect to the evidence against Defendant. We therefore are unable to assess the strength of the evidence against Defendant.
{21} Although the issue of prejudice requires objective evidence, where that evidence is sparse, the question may well turn on what the defendant would have been motivated to do if given accurate information. See Lewandowski v. Makel, 949 F.2d 884, 889 (6th Cir.1991) ("[I]n cases such as this where the question turns on the motivation of the defendant  that is, what would the defendant have done if supplied with accurate information  the amount of objective evidence will quite understandably be sparse."). Defendant's testimony that he has lived in the United States virtually his whole life, having been brought to his country right after he was born, may have been an important factor in his decision whether to enter a plea. See United States v. Couto, 311 F.3d 179, 191 (2d Cir.2002) ("Defendant's overriding concern is remaining in the United States and hence that she very likely would not have pleaded guilty if she had understood the deportation consequences of [her] plea[.]").
{22} The abuse of discretion standard of review often involves mixed questions of law and fact. In the present case, the district court ended its analysis by holding against Defendant as to the first prong of the Strickland two-prong test thereby avoiding the need to address the prejudice prong. We prefer that the district court address the prejudice issue and provide findings underlying or reasons for the court's ultimate determination. See Barnett, 1998-NMCA-105, ¶ 33, 125 N.M. 739, 965 P.2d 323 (stating that the record was "unclear as to whether [d]efendant would have . . . proceeded to trial if he had been competently advised," and that "the proper course [was] to remand to the trial court for an evidentiary hearing to determine if [d]efendant was prejudiced by the deficient performances of his attorneys in counseling his plea"); see also Lewandowski, 949 F.2d at 889 (stating that deference was "especially warranted" to the district court's factual finding as to whether the defendant would have chosen to proceed in a particular *905 way had he been adequately apprised of the risks, "because the critical evidence was testimonial").
CONCLUSION
{23} Defendant established ineffective assistance of counsel under Paredez. The district court therefore erred in holding that Defendant failed to prove ineffective assistance of counsel. We reverse and remand to the district court to conduct further proceedings and to determine under the second prong of the Strickland standard whether Defendant was prejudiced.
{24} IT IS SO ORDERED.
I CONCUR: RODERICK T. KENNEDY, Judge.
MICHAEL E. VIGIL, Judge (specially concurring).
VIGIL, Judge (specially concurring).
{25} Paredez raises many difficult questions concerning what advice a criminal defense lawyer is required to provide about the immigration consequences of a plea to render effective assistance of counsel as required by the Sixth Amendment. In no uncertain terms, our Supreme court holds: "If a client is a non-citizen, the attorney must advise that client of the specific immigration consequences of pleading guilty, including whether deportation would be virtually certain." 2004-NMSC-036, ¶ 19, 136 N.M. 533, 101 P.3d 799 (emphasis added).
{26} In order to comply with this mandate, two critical questions must be answered: (1) to what degree must a criminal defense attorney practicing in state court become educated and experienced in federal immigration deportation statutes, process, and case law in order to advise what the "specific immigration consequences" will be to the defendant; and (2) to what degree of specificity must counsel advise the defendant with respect to the immigration consequences of pleading guilty. These questions are especially critical to public defenders, who represent most of the criminal defendants appearing in our courts including Defendant in this case. Because New Mexico is a border state, possible immigration consequences are a concern to a substantial portion of their clients. Furthermore, since their clients are indigent, they cannot, by definition, independently hire a separate attorney to advise them of their own specific immigration concerns.
{27} Even if the foregoing questions can be answered, Paredez also seems to suggest that when counsel does not accurately predict the "specific immigration consequences of pleading guilty," counsel has rendered ineffective assistance. On the one hand, Paredez states that counsel "must" advise her client of "the specific consequences of pleading guilty," id. ¶ 19, and on the other hand, Paredez recognizes that when advice about those consequences is incorrect, counsel may be deemed to have rendered ineffective assistance of counsel. Id. ¶¶ 15, 17. Is counsel therefore charged with the responsibility of accurately predicting what future course of action the federal government will take in every specific case? It is recognized that immigration consequences can be varied, and can depend on a variety of factors. See, e.g., Thomas Alexander Aleinikoff et al., Immigration and Citizenship, Process and Policy 577-78, 581-85 (5th ed.2003) (pointing out ambiguities and nuances in the laws and indicating some non-citizens are eligible for several forms of relief other than removal). Nevertheless, in case after case, defendants attempt to withdraw pleas because counsel has inaccurately predicted the immigration consequences. See Greg S. Sarno, Annotation, Ineffective Assistance of Counsel: Misrepresentation, or Failure to Advise, of Immigration Consequences of Guilty Plea-State Cases, 65 A.L.R.4th 719 (1988).
{28} Finally, Paredez does not require the court at the plea hearing to inquire of both the defendant and defense counsel on the record what specific advice was given to the defendant about the immigration consequences of the plea. Instead, as in this case, trial courts are faced with after-the-fact recitations by defense counsel and the defendant about the details of their conversations at a subsequent hearing on ineffective assistance of counsel.
{29} Deportation is much more than a mere "collateral" consequence of pleading guilty, and often results in much harsher *906 consequences than the actual sentence itself. Paredez recognizes this reality and seeks to guarantee that non-citizens, particularly indigent non-citizens, receive adequate advice from their attorney about the potential and probable immigration consequences of pleading guilty, thus insuring that a guilty plea is knowingly and voluntarily made. However, in seeking to achieve its objective, Paredez raises several difficult questions, some of which I have attempted to set forth. If Paredez was not so specific in setting forth the obligations of counsel, I would conclude that the assistance rendered by Defendant's counsel in this case was within the range of competence demanded of attorneys in criminal cases, and therefore effective.
{30} However, the difficult questions raised by Paredez need not be answered in this case because Paredez not only requires the attorney to advise the non-citizen client of "the specific immigration consequences of pleading guilty," that advice must also include "whether deportation would be virtually certain." Id. ¶ 19. Here, Defendant pled guilty to false imprisonment in violation of Section 30-4-3, and battery against a household member in violation of Section 30-3-15. As explained below, these are "aggravated felonies" under federal immigration law, making Defendant's deportation "virtually certain." Since Defendant was not advised he was pleading guilty to "aggravated felonies" making his deportation "virtually certain," Paredez requires that Defendant's plea be set aside if he can demonstrate the requisite prejudice.
{31} Federal law at 8 U.S.C. § 1227(a)(2)(A)(iii) states, "Any alien who is convicted of an aggravated felony at any time after admission is deportable," and the Attorney General cannot cancel the removal of an alien who has been convicted of "any aggravated felony." 8 U.S.C. 1229b(a)(3). Thus, the deportation of any non-citizen who commits an "aggravated felony" is "virtually certain." See United States v. Amador-Leal, 276 F.3d 511, 516 (9th Cir.2002) (stating that removal of non-citizens who commit aggravated felonies is "virtually certain"). An "aggravated felony" is defined in 8 U.S.C. § 1101(a)(43). Subsection (F) of this statute includes within the definition "a crime of violence (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment [is] at least one year." 18 U.S.C. § 16 in turn states:
The term "crime of violence" means 
(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.
{32} False imprisonment under Section 30-4-3 is a felony, and it "consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so." Id. At least one federal court has concluded this offense is a "crime of violence." See United States v. Zamora, 222 F.3d 756, 764 (10th Cir.2000) (concluding that the crime of false imprisonment under New Mexico law is a "crime of violence" under sentencing guideline worded identically to 18 U.S.C. § 16(a)); see also Dickson v. Ashcroft, 346 F.3d 44, 49-51 (2d Cir.2003) (concluding that when the restraint constituting false imprisonment is accomplished by deception, the offense will either involve the use of force to effectuate the restraint, or by its nature involve a substantial risk that force may be used).
{33} Battery against a household member under Section 30-3-15 "consists of the unlawful, intentional touching or application of force to the person of a household member, when done in a rude, insolent or angry manner." This crime clearly has as an element the use, attempted use, or threatened use of physical force against the person of another, and fits the definition of a "crime of violence" under 18 U.S.C. § 16(a). See Singh v. Gonzales, 432 F.3d 533, 539 (3d Cir.2006) (concluding that Pennsylvania misdemeanor *907 crime of simple assault is a "crime of violence" under 18 U.S.C. § 16(a) because it requires some physical act by the perpetrator intended to cause fear of imminent serious bodily injury in the victim).
{34} For the foregoing reasons, I specially concur in the result reached by the majority.
NOTES
[1] Two of the cases relied on for this standard by our Supreme Court in deciding Paredez were reversed after Paredez was decided. See id. ¶ 15 (citing Gonzalez v. State, 191 Or.App. 587, 83 P.3d 921, 925 (2004), rev'd, 340 Or. 452, 134 P.3d 955 (2006), and State v. Rojas-Martinez, 73 P.3d 967, 970 (Utah Ct.App.2003), rev'd, 125 P.3d 930 (Utah 2005)).
[2] We cannot close the ineffective assistance of counsel issue without noting that we share the same concerns expressed by Judge Vigil in his concurring opinion. See Aguilera v. Palm Harbor Homes, Inc., 2002-NMSC-029, ¶ 6, 132 N.M. 715, 54 P.3d 993 (stating that the Supreme Court "encourages the Court of Appeals to express its rationale for any reservations it might harbor over Supreme Court precedent" (internal quotation marks and citation omitted)).