# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: October 11, 2018

**No. A-1-CA-35602**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**ROMAN F. MONTANO, SR.,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Benjamin Chavez, District Judge**

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Twohig Law Firm
Ray Twohig
Albuquerque, NM

for Appellant

# OPINION

**ATTREP, Judge.**

{1}      Pursuant to a plea agreement, Defendant Roman F. Montano, Sr. pleaded guilty to first degree criminal sexual penetration, in violation of NMSA 1978, Section 30-9-11(D)(1) (2009), as well as criminal sexual contact of a minor in the second and third degrees, in violation of NMSA 1978, Section 30-9-13(B)(1), (C)(1) (2003). Defendant then moved to withdraw his guilty plea, arguing that his attorney had been ineffective on a number of grounds. At the evidentiary hearing on his motion, Defendant's paramount claim was that counsel provided ineffective assistance by erroneously informing him that his DNA was found on the couch where the incident occurred, when in fact there was no such DNA evidence. It also became clear at the hearing that Defendant had been advised by counsel that he could plead guilty and later attempt to withdraw his plea through another attorney. Although Defendant acted on this advice, he did not claim this advice was ineffective below nor does he make such a claim on appeal. The district court denied Defendant's motion to withdraw his plea, and Defendant appealed. Although the advice regarding the DNA was deficient, we determine that Defendant has failed to establish there is a reasonable probability he would have gone to trial instead of pleading guilty had counsel not acted unreasonably. We therefore affirm.

**BACKGROUND**

{2}     The charges in this case arose from an incident between Defendant and his then twelve-year-old female cousin G.H. in August 2009. At the time of the incident, G.H. had spent the weekend at Defendant's residence for a family celebration. Other family members were present during the weekend. After G.H. left Defendant's residence, she reported to law enforcement that Defendant had fondled her breast and vagina and had penetrated her vagina briefly. G.H. then underwent a sexual abuse examination during which samples were collected for DNA testing. Law enforcement arrived at Defendant's residence later that evening to execute a search warrant. Defendant waived his *Miranda* rights and spoke with a law enforcement officer regarding the incident. Defendant stated that the incident occurred on a couch in his residence. Defendant claimed that G.H. initiated sexual contact with him. During the interview, Defendant eventually admitted to touching G.H.'s breast, rubbing his penis against G.H.'s vagina, and briefly penetrating G.H.'s vagina. Law enforcement collected samples from the couch, Defendant, and Defendant's clothing for DNA testing. Defendant was charged with criminal sexual penetration in the first degree (child under 13), two counts of criminal sexual contact of a minor in the second degree, and kidnapping.

**DISCUSSION**

{3}     This case languished for nearly five years in district court prior to Defendant's guilty plea. Defendant was represented by a public defender until approximately June 2012 when contract public defender Jonathan Miller entered his appearance. Mr. Miller represented Defendant until he pleaded guilty in June 2014 at docket call. Trial was to begin the day of docket call or the next day. The State tendered a plea offer the morning of docket call. At docket call, Mr. Miller moved for a continuance on the ground that he wanted to explore a potential conflict between the investigating agent at New Mexico State Police (NMSP) and G.H.'s mother, who was an employee of NMSP at the time of the incident. Mr. Miller represented to the court that he was otherwise ready for trial. Defendant personally spoke out in support of the motion to continue, asking for additional time to look into the case with Mr. Miller and defense investigator, William David Meek. The court denied the request for a continuance, citing the age of the case. Mr. Miller then reiterated that he was ready to go to trial.

{4}     The court recessed for Mr. Miller to speak with Defendant about the pending plea offer. After the almost one-hour break, Defendant moved to discharge Mr. Miller as his attorney. As grounds, Mr. Miller stated that Defendant was displeased because counsel had not previously stressed how damning Defendant's confession was to the case. Mr. Miller again reiterated he was ready to go to trial. In support

3

of his motion, Defendant stated that "there's just been a lot of things that haven't been done properly, and . . . I need to seek different counsel[.]" The district court denied the motion to discharge counsel. At that point, the court took another one-hour recess. After the recess, Mr. Miller informed the court that there likely was a plea, at which point the court recessed for another two hours. Upon court resuming, Defendant pleaded guilty pursuant to a plea agreement to first degree criminal sexual penetration and criminal sexual contact of a minor in the second and third degrees. Sentencing was postponed for three months upon the request of the defense to present mitigation evidence.

{5}     After pleading guilty, Defendant retained private counsel who filed a motion to withdraw the plea, asserting that Defendant's plea was not knowing and voluntary due to Mr. Miller's ineffective assistance. In the motion, Defendant argued that the public defender contract system was constitutionally deficient, essentially guaranteeing ineffective assistance in this case, and that counsel was deficient by, inter alia, failing to investigate defense witnesses and file a witness list. Five months after filing the motion, Defendant filed a supplement to the motion, asserting that Defendant had been erroneously informed that there was DNA evidence against him and claiming "the [DNA] result was a central factor in the plea discussions[.]" Sentencing was postponed until resolution of the motion.

4

**{6}** At the evidentiary hearing on Defendant's motion to withdraw the plea, Mr. Miller, defense investigator Mr. Meek, Defendant's fiancée Erminia Marie Velarde, Defendant, Maurice Moya (expert on investigating crimes against children), and Lelia Hood (director of the contract public defender system) all testified. Relevant testimony is briefly summarized here; additional detail is discussed as needed in our analysis.

**{7}** At the evidentiary hearing, Mr. Miller readily admitted to erroneously advising Defendant that his semen and DNA were found on the couch. The State's laboratory report in fact did not show a positive test result for semen or male DNA on the couch. Counsel's mistaken belief likely came from a police report in which a preliminary test showed a presumptive presence of semen. Mr. Miller first informed Defendant of this purported DNA evidence at a meeting several days before docket call and advised Defendant that the DNA evidence could be damaging at trial. Prior to this, Defendant had been told by his previous attorney that there was no DNA evidence against him. Defendant understood that the DNA evidence the State allegedly had was on his couch, not on G.H., and that there were plausible alternative explanations for his DNA being on the couch.[1]

---

[1] In his brief in chief, Defendant asserts that "Mr. Miller told [Defendant] that they had his DNA, which he thought meant that the claim of penetration which the alleged victim had made could be proven through the use of DNA evidence." There is no record citation for this assertion and, as far as we can tell, there simply is no support in the record for this assertion. To the contrary, Defendant clearly

**{8}** At the pre-docket call meeting, Defendant, Ms. Velarde, Mr. Miller, and Mr. Meek met to discuss the case. This was the first time Defendant had met Mr. Meek. Mr. Miller testified that he went over the evidence with Defendant, including Defendant's confession, G.H.'s credibility, and the fact that Mr. Meek had interviewed all the State's witnesses. At the meeting, Mr. Miller told Defendant that he would have a choice at docket call—plead guilty or go to trial—and Defendant wanted to proceed to trial notwithstanding the purported DNA evidence. Mr. Miller testified that he prepared for trial over the weekend and was ready for trial the day of docket call.

**{9}** At docket call on June 30, 2014, Mr. Miller informed Defendant that trial would begin the next day. Defendant testified that he was caught off guard and was in shock that trial was starting so soon.[2] Mr. Miller told Defendant he was ready to go to trial but explained that he requested a continuance due to Defendant's agitation and nervousness. Defendant testified that he did not believe Mr. Miller was prepared to go to trial because he had not interviewed witnesses identified by Defendant and had not moved to suppress Defendant's confession. During the multiple recesses at docket call, Defendant considered whether to plead guilty or

testified that he understood the DNA "was on my couch where the alleged incident occurred."

[2] It should be noted that Defendant received a copy of the notice of docket call, which provided that trial was to begin on July 1, 2014.

go to trial. Defendant spoke throughout the day with Ms. Velarde, Mr. Miller, and Mr. Meek. Defendant testified that, even though Mr. Miller emphasized the strength of the State's case (including the non-existent DNA), "I honestly was going to go to trial and lose so I could appeal it. That's what I was going to do." But Defendant also testified that he took the plea because of the DNA evidence and because Mr. Miller emphasized the DNA evidence was harmful. Mr. Miller testified that, in his view, the DNA was not so damning, it was Defendant's confession and G.H.'s testimony that concerned him. Mr. Miller advised Defendant to take the plea.

{10}   At some point, Defendant asked Mr. Miller if there was any other option. Counsel advised Defendant that he could plead guilty and then attempt to withdraw his guilty plea with another attorney. Mr. Miller made no guarantees about whether this tactic would work, but Defendant thought "it [was] worth a shot." Defendant then entered into the plea agreement with the intention of later attempting to withdraw his guilty plea.

{11}   The district court denied Defendant's motion to withdraw his plea. The court concluded that the only basis for deficient performance was the erroneous advice regarding the non-existent DNA. The district court, nonetheless, concluded that Defendant had not demonstrated the prejudice necessary to establish a claim of ineffective assistance of counsel because there was no reasonable probability that

7

Defendant would have gone to trial if properly advised about the DNA evidence. The district court further concluded that "the evidence . . . demonstrate[s] a strategic decision [by Defendant] to enter into the plea in order to delay the trial and to hire a new attorney." This appeal followed after entry of judgment and sentence.

**DISCUSSION**

**I.      Standard of Review**

{12}      "A motion to withdraw a guilty plea is addressed to the sound discretion of the [district] court, and we review the [district] court's denial of such a motion only for abuse of discretion." *State v. Favela*, 2015-NMSC-005, ¶ 9, 343 P.3d 178 (internal quotation marks and citation omitted). "A [district] court abuses its discretion when it denies a motion to withdraw a plea that was not knowing or voluntary." *State v. Hunter*, 2006-NMSC-043, ¶ 12, 140 N.M. 406, 143 P.3d 168. "Where, as here, a defendant is represented by an attorney during the plea process and enters a plea upon the advice of that attorney, the voluntariness and intelligence of the defendant's plea generally depends on whether the attorney rendered ineffective assistance in counseling the plea." *Favela*, 2015-NMSC-005, ¶ 9 (internal quotation marks and citation omitted). "We review claims of ineffective assistance under a mixed standard of review, viewing the factual record in the light most favorable to the court's ruling but deciding de novo whether

8

counsel was ineffective as a matter of law." *State v. Gutierrez*, 2016-NMCA-077, ¶ 33, 380 P.3d 872; *see id.* ("defer[ring] to the district court's findings of fact when they are supported by the record").

{13} "The two-part standard delineated in *Strickland v. Washington*, 466 U.S. 668 . . . (1984), applies to ineffective-assistance claims arising out of a plea agreement." *State v. Paredez*, 2004-NMSC-036, ¶ 13, 136 N.M. 533, 101 P.3d 799. "To establish ineffective assistance of counsel, a defendant must show: (1) 'counsel's performance was deficient,' and (2) 'the deficient performance prejudiced the defense.'" *Id.* (quoting *Strickland*, 466 U.S. at 687).

## II.     Deficient Performance

{14} "Counsel's performance is deficient if it 'fell below an objective standard of reasonableness.'" *Hunter*, 2006-NMSC-043, ¶ 13 (quoting *Strickland*, 466 U.S. at 688). "We indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks and citations omitted).

{15} Defendant argues that his counsel's performance fell below an objective standard of reasonableness in three broad respects: (1) counsel failed to file a motion to suppress Defendant's confession, (2) counsel undertook inadequate

pretrial investigation and preparation, and (3) counsel erroneously advised Defendant of the existence of DNA evidence when there was none. On their face, Defendant's allegations of his counsel's deficiencies give us pause; however, a review of the entire record reveals that Defendant's claim of ineffective assistance does not withstand scrutiny. *See State v. Martinez*, 2007-NMCA-160, ¶¶ 20-28, 143 N.M. 96, 173 P.3d 18 (holding that myriad claims of ineffective assistance in child sex crime case were without merit upon a review of the entire record).

{16}    Defendant first argues that counsel was ineffective in failing to move to suppress his confession to law enforcement as involuntary. "Where, as here, the ineffective assistance of counsel claim is premised on counsel's failure to move to suppress evidence, [the d]efendant 'must establish that the facts support the motion to suppress and that a reasonably competent attorney could not have decided that such a motion was unwarranted.'" *State v. Mosley*, 2014-NMCA-094, ¶ 20, 335 P.3d 244 (quoting *Patterson v. LeMaster*, 2001-NMSC-013, ¶ 19, 130 N.M. 179, 21 P.3d 1032). Whether a confession is involuntary depends on whether "official coercion" has occurred. *State v. Evans*, 2009-NMSC-027, ¶ 33, 146 N.M. 319, 210 P.3d 216. "Official coercion occurs when a defendant's will has been overborne and his capacity for self-determination has been critically impaired." *Id.* (alterations, internal quotation marks, and citations omitted). In determining the voluntariness of a defendant's confession, courts look at the totality of the

10

circumstances. *State v. Fekete*, 1995-NMSC-049, ¶ 34, 120 N.M. 290, 901 P.2d 708. "[U]nder the totality of circumstances test, a confession is not involuntary solely because of a defendant's mental state. Instead, the totality of circumstances test includes an element of police overreaching." *Id.* ¶ 35.

{17} Defendant's argument that counsel should have filed a motion to suppress his confession is premised on his alleged intoxication. During the interview, Defendant stated that he had been drinking and that he was "a little buzzed," but he was thinking clearly. Defendant asserts that had defense witnesses been interviewed, they would have supported his contention that he was intoxicated at the time of his confession. [3] Defendant, however, does not argue that law enforcement was engaged in improper coercion when interviewing him. Defendant further concedes that a motion to suppress his confession may have been denied on this basis. As previously stated, Defendant's intoxication, or state of mind, alone is insufficient to render a confession involuntary without accompanying police misconduct or overreaching. *See Fekete*, 1995-NMSC-049, ¶¶ 35, 38; *see also State v. Cooper*, 1997-NMSC-058, ¶ 47, 124 N.M. 277, 949 P.2d 660 (holding that the defendant's confession was voluntary because although the defendant was

---

[3] In his reply brief, Defendant claims that witnesses said he had a lot to drink prior to his confession. There is no record citation for this assertion, we have found none, and we accordingly need not consider it. *See In re Aaron L.*, 2000-NMCA-024, ¶ 27, 128 N.M. 641, 996 P.2d 431 ("This Court will not consider and counsel should not refer to matters not of record in their briefs.").

11

"most likely in a weakened mental state," officers did not exploit the defendant's mental state to obtain the confession). As such, Defendant has not established a factual basis to support the filing of a motion to suppress his confession. And "trial counsel is not incompetent for failing to make a motion when the record does not support the motion." *State v. Stenz*, 1990-NMCA-005, ¶ 7, 109 N.M. 536, 787 P.2d 455.

{18} Second, Defendant argues that counsel failed to undertake an adequate pretrial investigation and to prepare for trial. In support of this, Defendant refers generally to counsel's failure to investigate witnesses identified by Defendant, failure to file a defense witness list, and failure to pursue pretrial motions.[4] "'[C]ounsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary.'" *Lytle v. Jordan*, 2001-NMSC-016, ¶ 40, 130 N.M. 198, 22 P.3d 666 (alteration and emphasis in original) (quoting *Strickland*, 466 U.S. at 691); *see also State v. Barnett*, 1998-NMCA-105, ¶ 30, 125 N.M. 739, 965 P.2d 323 ("Failure to make adequate pretrial investigation and preparation may . . . be grounds for finding ineffective assistance of counsel." (internal quotation marks and citation omitted)). "'In any ineffectiveness case, a

---

[4] Other than the motion to suppress his confession, Defendant does not identify any other specific pretrial motion he contends should have been filed. We, accordingly, need not address this issue further. *See Corona v. Corona*, 2014-NMCA-071, ¶ 28, 329 P.3d 701 ("This Court has no duty to review an argument that is not adequately developed.").

12

particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Lytle*, 2001-NMSC-016, ¶ 40 (quoting *Strickland*, 466 U.S. at 691).

{19} In his briefing, Defendant does not identify the witnesses he requested be interviewed or what specific testimony these witnesses would have offered.[5] Instead, Defendant generally argues that, had counsel interviewed defense witnesses, this "would have enabled him to effectively challenge the alleged confession and defend the charges against him." Defendant does not elaborate on this bald claim. Instead, Defendant simply asserts that Mr. Moya (expert on investigating crimes against children) "learned key information [that] would have been important to the defense in the case[,]" citing, without discussion, four pages of Mr. Moya's testimony. In the cited transcript, Mr. Moya testified that there were witnesses who knew how much alcohol was served over the weekend in question, but Mr. Moya provided no specifics regarding how much alcohol Defendant consumed. Mr. Moya further testified that a witness knew that both Defendant and G.H. had been up late the night of the incident and that G.H. may have been menstruating. Defendant never explains how this information would have enabled him to better defend against the charges, and it is not apparent from the record

---

[5] Although not identified in Defendant's briefing, it appears that the potential witnesses were Defendant's family members who were present during the relevant weekend.

13

before us. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("We will not review unclear arguments, or guess at what a party's arguments might be." (alteration, internal quotation marks, and citation omitted)).

**{20}** Further, Mr. Miller explained that the potential defense witnesses did not have knowledge about the incident. Instead, Mr. Miller understood that their knowledge was limited to Defendant's level of intoxication, which already has been addressed, and their assessment of G.H.'s and Defendant's credibility and character. Counsel believed such testimony would be more prejudicial than probative given that it may have opened the door to Defendant's prior felony convictions. Particularly in light of the fact that there is no developed record about what these witnesses would have testified to, we cannot assume their testimony would have been helpful, and we will not second guess counsel's tactical determination that the testimony would have proven more harmful than helpful. *See State v. Nguyen*, 2008-NMCA-073, ¶ 30, 144 N.M. 197, 185 P.3d 368 (citing *Lytle*, 2001-NMSC-016, ¶ 43 (stating that on appeal, we will not second guess the trial strategy and tactics of the defense counsel)); *see also State v. Orosco*, 1991-NMCA-084, ¶ 36, 113 N.M. 789, 833 P.2d 1155 ("Without more facts indicating that trial counsel's actions were truly an error and not a strategy, we cannot say there was ineffective assistance of counsel on this basis."), *aff'd*, 1992-NMSC-006, ¶ 32, 113 N.M. 780, 833 P.2d 1146. In short, Defendant's general assertions of

14

inadequate pretrial investigation and preparation are insufficient to establish a claim of ineffective assistance. *See State v. Cordova*, 2014-NMCA-081, ¶ 10, 331 P.3d 980 ("A general claim of failure to investigate is not sufficient to establish a prima facie case if there is no evidence in the record indicating what information would have been discovered.").

{21} Finally, it is undisputed that counsel misinformed Defendant that his DNA was found on the couch where the incident occurred, when in fact there was no such DNA evidence.[6] The State does not contest that this advice was deficient, and, as such, we assume that counsel's advice regarding the existence of DNA was deficient. Thus, the question then becomes whether this deficient performance prejudiced Defendant. *See Paredez*, 2004-NMSC-036, ¶ 13.

---

[6] Defendant argues in passing that the State's laboratory report could have been used as exculpatory evidence that there was no penetration. Defendant's implicit claim here is that one would expect to find semen or male DNA on G.H. But under the particular facts of this case—where both G.H. and Defendant stated that the penetration lasted only ten to fifteen seconds and the sexual assault examination occurred hours after the assault—Defendant's assertion about the exculpatory nature of the State's laboratory report is drawn into doubt. Without expert testimony to support Defendant's claim regarding the exculpatory nature of the report, we decline to entertain this undeveloped argument. *See State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031 (explaining that appellate courts are under no obligation to review unclear or undeveloped arguments); *Chan v. Montoya*, 2011-NMCA-072, ¶ 9, 150 N.M. 44, 256 P.3d 987 ("It is not our practice to rely on assertions of counsel unaccompanied by support in the record. The mere assertions and arguments of counsel are not evidence." (internal quotation marks and citation omitted)).

## III.     Prejudice

{22}     Under *Strickland*'s second prong, in order to establish prejudice, "[a] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. In the plea context, "a defendant must establish that . . . but for counsel's errors, he would not have pleaded guilty and instead gone to trial." *Patterson*, 2001-NMSC-013, ¶ 18 (internal quotation marks and citation omitted).

## A.     We Will Not Presume Prejudice in This Case

{23}     Before examining whether Defendant has met his burden to show he suffered prejudice as a result of counsel's error, we address the threshold argument advanced by Defendant. Defendant argues that—given the circumstances of this case, in particular the alleged systemic problems with the contract public defender system—Defendant is relieved of showing prejudice. In support of this argument, Defendant relies on the testimony of Ms. Hood regarding the public defender contract system and on *State v. Schoonmaker*, 2008-NMSC-010, 143 N.M. 373, 176 P.3d 1105, *overruled on other grounds by State v. Consaul*, 2014-NMSC-030, ¶ 38, 332 P.3d 850. We take these in turn.

{24}     Ms. Hood testified at length regarding her general observations about the

16

contract public defender system and the negative incentives that result from this system. Ms. Hood dubbed the contract public defender system the "hamster wheel of injustice," in which counsel are forced to take on more and more cases to stay in business (given the low flat fees) and, consequently, are unable to expend the necessary time and resources on each case. The value of this testimony is drawn into question in light of our Supreme Court's decision in *Kerr v. Parsons*, 2016-NMSC-028, 378 P.3d 1. In *Kerr*, the Supreme Court held that deficient performance would not be presumed from the flat-fee public defender contract system. *See id.* ¶ 25 ("find[ing] no basis to presume that any indigent defendant currently represented by contract counsel necessarily receives constitutionally deficient assistance"). Given *Kerr*, Ms. Hood's general observations about the deficiencies with the contract public defender system do not provide a basis for presuming prejudice in this case.

**{25}** Ms. Hood further opined—without undertaking a review of Mr. Miller's testimony, his file, or the witness interviews conducted by the defense—that the negative effects of the contract public defender system were at play in this case, impacted counsel's performance, and removed Defendant's choice to plea or go to trial. Defendant argues that Ms. Hood's opinions "should have been accepted and applied by the trial judge[.]" This argument is directly contrary to our Supreme Court's decision in *Lytle*. In *Lytle*, defense offered expert attorney testimony on the

17

issue of whether defense counsel was ineffective. 2001-NMSC-016, ¶¶ 48-49. Our Supreme Court stated that "it is superfluous for expert witnesses to advise a court, whether it is the district court or an appellate court, about the proper application of existing law to the established historical facts and about the ultimate issue of trial counsel's effectiveness." *Id.* ¶ 49. The Court accordingly rejected the expert's testimony concerning defense counsel's performance. *Id.* Likewise, here, the district court was free to disregard Ms. Hood's opinion regarding counsel's ineffectiveness.

{26}     Defendant additionally cites to *Schoonmaker* in support of his argument that he need not show prejudice in this case. In *Schoonmaker*, the defendant was represented by private counsel but could not afford to pay for expert witnesses that were essential to his defense. 2008-NMSC-010, ¶ 1. Counsel advised the district court of this situation and requested necessary funding or, in the alternative, leave to withdraw in favor of the public defender so that experts could be hired using public funding. *Id.* ¶ 17. The district court refused these requests and the defendant was forced to go to trial without essential expert witnesses. *Id.* ¶¶ 19-20. The *Schoonmaker* Court held that a presumption of prejudice applied in that case because "the district court essentially put [the d]efendant in the position of receiving ineffective assistance of counsel." *Id.* ¶¶ 1, 36. This case is distinguishable from *Schoonmaker*. In this case, counsel repeatedly represented to

18

the district court at the docket call that he was prepared to go to trial notwithstanding his client's displeasure. This is not the case where counsel alerted the district court of the need for tools essential for trial without which ineffective assistance was guaranteed. We accordingly conclude that *Schoonmaker* does not control here, and we will not presume prejudice in this case.

**B.    Defendant Has Not Established That He Was Prejudiced by Counsel's Unreasonable Advice**

{27}    We now examine whether Defendant has met his burden in establishing prejudice. "The question is whether there is a reasonable probability that the defendant would have gone to trial instead of pleading guilty . . . had counsel not acted unreasonably." *Patterson*, 2001-NMSC-013, ¶ 18 (internal quotation marks and citation omitted). In this case, "Defendant must show he would not have entered into the plea agreement if he had been given constitutionally adequate advice about [the DNA evidence in his case]." *Hunter*, 2006-NMSC-043, ¶ 26. "[I]n assessing whether a defendant has been prejudiced by an attorney's deficient performance, 'courts are reluctant to rely solely on the self-serving statements of defendants.'" *Favela*, 2015-NMSC-005, ¶ 19 (quoting *Patterson*, 2001-NMSC-013, ¶ 29). "Thus, a defendant will often need to provide additional, objective evidence of prejudice." *Id.* In this context, our courts have considered the defendant's pre-conviction statements and actions as well as the strength of the state's evidence to adduce whether the defendant was disposed to plead or go to

trial. *Patterson*, 2001-NMSC-013, ¶¶ 30-31.

{28} We first consider the testimony presented at the evidentiary hearing. Defendant points to his and Ms. Velarde's testimony about the importance of the DNA evidence to Defendant's decision to plead guilty. Mr. Miller and Mr. Meek, however, provided contrary testimony, stating that other aspects of the State's case were emphasized in the plea discussions with Defendant. The district court chose not to credit Defendant and Ms. Velarde's testimony regarding the importance of the non-existent DNA evidence in Defendant's plea decision process. We defer to the district court's resolution of conflicting evidence. *See Gutierrez*, 2016-NMCA-077, ¶ 33 ("defer[ring] to the district court's findings of fact when they are supported by the record"); *see also Evans*, 2009-NMSC-027, ¶ 37 ("If faced with conflicting evidence, [appellate courts] defer to the district court's factual findings, so long as those findings are supported by evidence in the record.").

{29} Moreover, the first time Defendant mentioned the importance of the DNA evidence was in his supplement to the motion to withdraw his plea, which came almost six months after the motion was filed and almost nine months after Defendant pleaded guilty. The district court found that Defendant's belated assertion of the importance of the DNA evidence undermined his testimony at the evidentiary hearing. Defendant claims the district court should not have held the delay in raising the DNA issue against him because successor counsel only

discovered Mr. Miller's error after the motion to withdraw the plea was filed. Defendant misses the mark. The fact that the advice regarding the DNA evidence turned out to be wrong does not change whether the non-existent DNA truly impacted the plea process. Had the DNA evidence been as important to Defendant's decision to plead guilty as he later claimed, why wasn't the issue mentioned at docket call or in the motion to withdraw the plea along with the myriad other claims of ineffective assistance? Defendant's belated assertion about the importance the DNA played on his plea decision weighs against him and supports the district court's rejection of Defendant's testimony at the evidentiary hearing. *See State v. Trammell*, 2016-NMSC-030, ¶ 26, 387 P.3d 220 (holding that the defendant's delay in asserting ground to withdraw plea "bolster[ed the Court's] conclusion that [the defendant's] claim that he would not have accepted his plea is self-serving").

**{30}** Second, we consider Defendant's pre-conviction statements and actions. Prior to his guilty plea, Defendant asserted his desire to go to trial. For example, Defendant rejected a more favorable plea offer in favor of interviewing G.H. But of particular significance to this case is the fact that, even *after* his attorney mistakenly advised him, several days before docket call, that DNA evidence existed, Defendant still wanted to go to trial. And on the day of docket call, Defendant still was planning to go to trial until the option of withdrawing his plea

21

with new counsel was presented. While a defendant's pre-conviction statements supporting a willingness to go to trial generally may weigh in favor of finding prejudice, in this instance it does not. The district court did not err in finding that Defendant's "testimony regarding the weight that the DNA played in his decision to plea is contradicted and outweighed by his clear willingness to proceed to trial with the DNA evidence."

{31} Third, we consider the strength of the State's evidence against Defendant. We do this "because the evidence against a defendant informs his or her decision about whether to challenge the charges at trial. . . . As the strength of the evidence increases, so does the likelihood that a defendant will accept a plea offer instead of going to trial." *Patterson*, 2001-NMSC-013, ¶ 31. The evidence against Defendant was significant. G.H. was described by counsel and the defense investigator as sympathetic, believable, consistent in her statements over a period of years, and difficult to impeach. Indeed, Mr. Miller thought Defendant could be convicted on G.H.'s testimony alone. Additionally, Defendant's confession plainly was damaging—Defendant admitted to law enforcement that he touched G.H.'s breast, rubbed his penis outside G.H.'s vagina, and penetrated G.H. for a brief period. Against this backdrop, Defendant received a benefit from the plea—if convicted at trial, he faced a term of imprisonment of fifty-one to sixty-six years, but if he pleaded guilty, his exposure was reduced to fourteen to thirty years.

22

**{32}** Finally, ample evidence supports the district court's determination that Defendant made a strategic decision to plead guilty, not because of the non-existent DNA evidence, but based on the advice of counsel to plead guilty and later attempt to withdraw his plea with new counsel. Although it is undisputed that Mr. Miller made no guarantees about whether this unorthodox approach would succeed, the reasonableness of counsel's advice to plead guilty with the intention of later withdrawing the plea based on claims of ineffective assistance appears questionable to us. We, however, do not pass on whether this advice amounted to ineffective assistance of counsel as this issue is not before us today.

**{33}** In light of the facts of this case, Defendant has failed to show that there is a reasonable probability that but for counsel's error regarding the non-existent DNA evidence he would not have pleaded guilty and, instead, would have insisted on going to trial.

**CONCLUSION**

**{34}** Because we hold that Defendant has failed to establish that he was prejudiced by counsel's deficient performance, Defendant's claim of ineffective assistance fails. As such, the district court did not abuse its discretion in denying Defendant's motion to withdraw his plea. The district court's order denying Defendant's motion is affirmed.

**{35}** **IT IS SO ORDERED.**

23

_____
**JENNIFER L. ATTREP, Judge**


**WE CONCUR:**


_____
**HENRY M. BOHNHOFF, Judge**


_____
**EMIL J. KIEHNE, Judge**

24